IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 10, 2001 Session

**STATE OF TENNESSEE v. ANTHONY H. DEAN**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-14047    James C. Beasley, Jr., Judge**

_____

**No. W2000-01156-CCA-R3-CD  - Filed September 28, 2001**

_____

The defendant was convicted of aggravated rape and sentenced to forty years as a violent offender. He timely appealed, alleging, *inter alia*, that the trial court erred in not suppressing a confession obtained, following his warrantless arrest, after he had been jailed for five days without a determination of probable cause; in allowing DNA results into evidence; and in permitting a forensic nurse examiner to testify as a keeper of the sexual assault resource center records. Based upon our review, we conclude that testimony regarding the records of the Memphis Sexual Assault Resource Center was properly admitted as business records testimony and that the DNA evidence was properly admitted, as well. We conclude that the defendant's confinement violated his Fourth Amendment rights and that his confession should have been suppressed. However, this error was harmless in light of the other evidence. Accordingly, we affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

A C Wharton, Jr., Shelby County Public Defender; and W. Mark Ward, Assistant Public Defender, for the appellant, Anthony H. Dean.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; J. Robert Carter, Assistant District Attorney General; and Paula Wulff, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Anthony H. Dean, was convicted in the Shelby County Criminal Court of aggravated rape and sentenced to forty years imprisonment as a violent offender. In his appeal, he presents the following issues:

I. The evidence of appellant's identity as the culprit is insufficient to support the verdict beyond a reasonable doubt.

II. The trial judge erred in failing to suppress appellant's confession and DNA evidence that was the "fruit of the poisonous tree" of his illegal detention without prompt presentation before a magistrate as required by the Fourth Amendment of the U.S. Constitution and Article I, Section 7 of the Tennessee Constitution.

III. The trial judge erred in allowing into evidence the business records of the Sexual Assault Resource Center as business records when they were made for the sole purpose of litigation.

IV. The trial judge erred in refusing to strike the testimony concerning the DNA testing of the appellant when the State failed to satisfy the "chain of evidence" requirement for admissibility of such evidence.

V. The errors which allowed into evidence both the alleged confession and the DNA testimony were such that their cumulative effect cannot be considered harmless error.

VI. The trial judge misapplied the enhancement factors in sentencing appellant to the maximum sentence of 40 years.

We conclude that the defendant's confession, taken on the fifth day of his confinement, following his warrantless arrest, without a determination of probable cause, was in violation of his Fourth Amendment rights although his rights were not violated by the taking of a DNA sample from him, pursuant to a search warrant, while he was incarcerated. Accordingly, it was error to admit the confession during the trial but not the DNA evidence. We further conclude that there was a sufficient showing as to the chain of custody of the defendant's blood sample resulting in testimony that the defendant's DNA matched the semen sample from the victim. As a result, we find that the admission of the confession was harmless. Although the trial court relied upon two inapplicable enhancement factors, the remaining factors justify the imposition of the sentence. Accordingly, we affirm the judgment of the trial court.

**DISCUSSION**

The victim, R.G.,[1] who was 92 years old at the time of trial, testified that as of the day of the crime, August 1, 1998, she was 89 years old, turning 90 about two weeks later. She said that she was awakened at about 4 a.m. after a man had come into her apartment through her balcony glass door. As she tried to rise from the bed, the intruder grabbed her throat and pushed her back. He tried to penetrate both her vagina and her anus, but was unsuccessful at first. However, on a second attempt, he did penetrate her vagina. As a result of the attack, the victim sustained tears and a laceration in her vagina and still had stiffness in her neck and pain in both her arm and shoulder at the time of the trial. Also, because of the position she was forced into during the rape, she had to begin using a cane or a walker, and was still doing so at the time of trial.

She testified that she recognized the intruder because he had been in her apartment the day before the attack. She had noticed him near her apartment door, and he said that he lived in a nearby apartment and had not seen one like hers. She invited him in and, during their conversation, said that she needed to have her hair cut. He told her that he was a barber and could cut her hair. He left but returned later that day, coming into her apartment without an invitation and telling the victim that he had come to cut her hair. She told him that she did not want her hair to be cut then, and he left again. While he was in her apartment, she told him that she kept her balcony door open during the night while she was sleeping. She said that, during one of her conversations with the defendant prior to the rape, he told her that he lived in apartment 1011 with another person. Subsequently, when first interviewed, the defendant was in apartment 1011. The victim lived in apartment 1001.

During direct examination, the victim testified that she had picked out a photograph of the man who attacked her, first saying, "That's the one I picked out and signed my name under it," and then explaining that she "[m]ight not have been positive but that's the one I picked out." When asked, during her trial testimony, whether the man who raped her was in the courtroom, she identified the defendant, saying, "He's sitting over there. I saw him when he came in." She also identified the defendant's black and white tennis shoes as being like those worn by her attacker. During cross-examination, the victim was asked if, apparently during the preliminary hearing, she had identified another man in the General Sessions courtroom as her attacker and appeared to deny that she had done so. However, Judge Tim Dwyer, of the Shelby County General Sessions Criminal Court, testifying as a defense witness, recalled that the victim, in her wheelchair, had testified during the preliminary hearing and had identified another man as her attacker.

Michael Carl Davis, who was the janitor and also a resident of the same apartment building where the victim lived, testified that he lived in apartment 1101, which was directly above the victim's apartment. He said that on the morning the victim was attacked, he was awakened just before 4 a.m. when a man, whom he identified as the defendant, came into his apartment. When Davis asked the defendant why he was there, the defendant replied, "I was just hollering at you." Davis recognized the defendant as having been in the building on previous occasions trying to get

---

[1]Because of the nature of the crime, we will identify the victim by her initials.

residents to let him cut their hair. He said that he was shown a series of photographs either later that day or the following day, and identified the photograph of the defendant as the man who had earlier asked to cut his hair and who had entered his apartment the morning of the rape. Additionally, he identified the defendant in the courtroom as the same man.

Sandra K. Anderson, a sexual assault nurse examiner with the Memphis Sexual Assault Resource Center ("MSARC"), testified that she had met with the victim at the hospital on the day of the rape and collected evidence consisting of vaginal and oral swabs, a blood standard for DNA analysis, and pubic hairs. She described the injuries, which she observed to the victim, and said that she had placed the rape kit in a locked storage area of the MSARC.

Sergeant Donald Ray Dickerson, a sex crimes investigator with the Memphis Police Department, testified that he had met with the victim on the day of the rape at the Regional Medical Center in Memphis. After she gave him a description of the man who had raped her, he then began talking with residents of the apartment building to see if any of them recognized the man from the description. He was told that a man meeting the description "frequent[ed]" an apartment which was on the same floor and a few units away from that of the victim. After several visits with no response to apartment 1011, the door was opened by a man, whom Dickerson later identified as the defendant. Dickerson observed that the defendant matched the description given by the victim of her attacker. During this visit to the apartment, Dickerson saw a pair of tennis shoes matching the victim's description of the shoes worn by her attacker. The defendant said that his name was "Tony Adams" and gave several different dates of birth. He also gave Dickerson his mother's name and telephone number but, after talking with her, Dickerson determined that the man with whom he had spoken was not Tony Adams but was the defendant, Anthony Harold Dean. With this information, Dickerson obtained a photograph of the defendant and showed it, along with photographs of others, to Michael Carl Davis. From this group, Davis identified that of the defendant as being the man who had come into his apartment on the morning of the rape. He also showed the photospread to the victim, and she identified and signed her name to a photograph of the defendant.

Dickerson then distributed a photograph of the defendant to other police officers because he wanted to question the defendant. He was notified on August 5, 1998, that the defendant had been taken into custody. Taken from the defendant at that time were the tennis shoes he was wearing and an entry card for the apartment building. Dickerson interviewed the defendant, who denied the rape or that he had been in the building when it occurred. The defendant remained in jail, and, on August 10, Dickerson obtained and served on the defendant a search warrant to take hair and blood samples, after the defendant had refused to voluntarily provide them. When the search warrant was served on the defendant, he told Dickerson that he wanted to talk about the case.

In the interview room, the defendant again was advised of his rights and gave a statement, which was read to the jury, admitting that he had entered the victim's apartment and raped her. After the statement was completed, blood and hair samples were obtained from the defendant by an employee of the MSARC, who also photographed the defendant and took his thumbprint.

-4-

Dickerson said that, at the preliminary hearing, the victim had identified another man as the person who had raped her. In redirect examination, Dickerson said that the victim was in a wheelchair during the preliminary hearing and that the defendant was standing in a group of nine or ten black males, all dressed in jail-issued clothing, when the victim identified another as her assailant. He described the person whom she identified as having "a lot of similarities" with the defendant, meaning they "had the approximate height, same height, same stature, build and somewhat complexion-wise" and the same "hairstyle."

Sally DiScenza, a forensic nurse examiner with the MSARC, testified as to the records of the Center, consisting of samples taken from the victim following the rape and blood drawn from the defendant for DNA analysis. This evidence was provided to the Tennessee Bureau of Investigation ("TBI") for examination and comparison.

Steven M. Wiechman, who at the time of the trial was employed by the Ohio Bureau of Criminal Identification and Investigation and a former employee of the TBI Crime Laboratory in Jackson, Tennessee, testified that while he was with the TBI, as a special agent forensic scientist, he had received and performed tests on the rape kit in this matter. He determined that spermatozoa and semen were present on the vaginal swabs and slide taken from the victim. He then sent the vaginal swabs and blood standard from the victim, as well as a second kit which contained a blood standard from the defendant, to the TBI Laboratory in Nashville for DNA analysis.

Raymond DePriest, a special agent forensic scientist with the TBI in Nashville, testified that he received and performed tests on the swabs from the victim and the blood sample from the defendant. Utilizing DNA profiling, he determined that the sperm fraction of both the vaginal and vulvar swabs from the victim matched the blood sample taken from the defendant. He testified that the "statistical probability of someone else being a contributor [of the sperm samples] is 1 in 6 billion." During cross-examination, he explained that this estimate actually was conservative and that the probability that a person other than the defendant had contributed the sperm recovered from the victim was one in forty-one quadrillion. Following the testimony of Agent DePriest, the State rested its case.

Kenneth Robinson, testifying as a defense witness, said that he was the building engineer for the apartment building in which the victim lived. He said that the apartments, including that in which the victim resided, had balconies approximately three feet wide which extended to the stairwells. A photograph identified by the victim of the building showed that a horizontal, concrete ledge ran alongside each of the balconies and extended beyond them. Robinson testified that by standing on this ledge and holding onto balcony railings, a person could go from balcony to balcony.

## ANALYSIS

Because of the relationship of the issues presented by the defendant, we will consider them in an order different from that set out by the parties.

## I. Suppression of Confession and DNA Evidence

The defendant argues that both his confession and DNA evidence resulting from the search warrant should have been suppressed because he was not taken timely before a magistrate. The State agrees that his appearance was not timely but argues that this fact does not require suppression of the confession or DNA evidence.

Relevant to our consideration is Tennessee Rule of Criminal Procedure 5(a), which provides:

> Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued, or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5. If a person arrested without a warrant is brought before a magistrate, an affidavit of complaint shall be filed forthwith. When an arrested person appears initially before a magistrate, the magistrate shall proceed in accordance with this rule.

Our supreme court explained, in State v. Carter, 16 S.W.3d 762, 765-66 (Tenn. 2000), the basis for the rule limiting the period of time an arrestee can be held in jail without a finding of probable cause:

> The Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual after a warrantless arrest. Gerstein v. Pugh, 420 U.S. 103, 114, 125, 95 S. Ct. 854, 863, 869, 43 L. Ed. 2d 54, 65, 72 (1975). Absent a bona fide emergency or extraordinary circumstance, a judicial determination of probable cause is "prompt" if it occurs within 48 hours. Riverside v. McLaughlin, 500 U.S. 44, 56-7, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49, 63 (1991). In making a judicial determination of probable cause, a full, adversarial proceeding is unnecessary. Gerstein, 420 U.S. at 118-22, 95 S. Ct. at 865-67, 43 L. Ed. 2d at 68-70. This is so because the standard for probable cause for prolonged detention is the same as the standard for determining probable cause for arrest--a standard "traditionally decided . . . by a magistrate in a nonadversary proceeding on hearsay and written testimony. . . ." Gerstein, 420 U.S. at 120, 95 S. Ct. at 866, 43 L. Ed. 2d at 69.

The parties agree that the defendant was not taken before a magistrate without "unnecessary delay," that a blood sample was taken from him pursuant to a search warrant, the validity of which is not challenged, during his fifth day of incarceration, and that he gave a confession to the charges

also on the fifth day.  We will now consider whether, as urged by the defense, either or both of these items of evidence must be suppressed.

The chronology, upon which we base our analysis, begins with the defendant's warrantless arrest on August 5, 1998, at 8:15 p.m. and continuing incarceration.  The record on appeal contains an affidavit of complaint, executed by Sergeant Dickerson on August 9, 1998, before the Shelby County General Sessions Court Clerk but not an arrest warrant.  Although the State referred to the August 9 document as the "affidavit of complaint, the State arrest warrant," this is not the case.  It appears to be a recitation of alleged probable cause for the arrest of the defendant, as set out in Tennessee Rule of Criminal Procedure 3.  However, the document does not reflect that, based upon the allegations, a finding of probable cause was made.  <u>See</u> Tenn. R. Crim. P. 4.  Apparently, he was first taken before a general sessions judge on August 11.  Because of the lack of clarity in the record, we are not presuming that an arrest warrant was issued on August 9, as the State asserts.

## A.  Confession

The defendant argues that the trial court mistakenly combined the factors in determining whether the defendant's confession must be suppressed because of the Rule 5(a), Tennessee Rules of Criminal Procedure, violation with those used to ascertain whether it should be suppressed because of the Fourth Amendment violation.  We agree with the defendant's analysis that these determinations, having different considerations, must be made separately.

First, we will consider the effect of the Tennessee Rule of Criminal Procedure 5(a) violation.  In making this determination, we will apply the factors set out in <u>People v. Cipriano</u>, 429 N.W.2d 781 (Mich. 1988), which were adopted by our supreme court in <u>State v. Huddleston</u>, 924 S.W.2d 666, 671 (Tenn. 1996).  To ascertain whether the defendant's confession must be suppressed because of the admitted Rule 5(a) violation, we must consider:

> [T]he age of the accused;  his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; *whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession*; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

<u>Id.</u> (quoting <u>Cipriano</u>, 429 N.W.2d at 790).

We will now review the applicable considerations. According to the presentence report, the defendant was 37 years of age at the time of his arrest. He was a high school graduate and said that he had attended State Technical Institute at Memphis, although his attendance could not be verified. His first arrest shown on the presentence report was in 1984, and, between that time and his arrest on the rape charge, he had been arrested at least twenty times. These arrests had resulted in convictions for two Class C felonies, robbery and aggravated burglary, and two Class E felonies, escape and attempted felony. In addition, he had approximately ten misdemeanor convictions and had been charged with being a parole violator. From all of this, it appears that the defendant is at least of average intelligence and is very experienced with the criminal process.

While incarcerated, the defendant was questioned twice about the incident, and both of his statements, the first a denial and the second a confession, were typed and contained his Miranda rights. According to Sergeant Dickerson, the second statement, which the defendant signed, was spontaneous, initiated by the defendant as a search warrant was being executed for the taking of samples of bodily fluids from him for DNA analysis. Although the defendant was detained for nearly five days before giving a confession, no proof was presented that the defendant suffered deprivation during this period, other than that resulting from confinement and from not being allowed to contact a relative or an attorney. There was no proof that he was injured, drugged, or in ill health at the time he confessed, or that he was threatened or abused to give the confession.

Based upon these factors, we conclude that the defendant's confession need not be suppressed despite the Rule 5(a) violation.

We will next consider whether the Fourth Amendment requires suppression of the confession. The factors in this consideration were outlined in Carter, 16 S.W.3d at 766:

> In State v. Huddleston, this Court determined that when a person confesses after having been detained for more than 48 hours following an arrest without a warrant and without a judicial determination of probable cause, the confession should be excluded unless the prosecution establishes that the confession "'was sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" 924 S.W.2d 666 (Tenn. 1996) (quoting Brown v. Illinois, 422 U.S. 590, 599, 95 S. Ct. 2254, 2261, 45 L. Ed. 2d 416, 424 (1975)). Four factors guide the issue of admissibility: "(1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct." Huddleston, 924 S.W.2d at 674-75 (citing Brown, 422 U.S. at 603-04, 95 S. Ct. at 2261-62, 45 L. Ed. 2d at 427). The burden is on the State to prove by a preponderance of the evidence the admissibility of a confession obtained under the circumstances here presented. Id. at 675.

We first note that the defendant was advised of his Miranda rights prior to his first statement on August 5 and, again, before his statement was taken on August 10. Accordingly, this factor favors admission of the statement.

Next, we consider the "temporal proximity of the arrest and the confession." Here, the defendant was held in the Shelby County Jail for approximately five days before confessing to the rape. This factor weighs in favor of suppression of the confession.

The record does not reveal any attenuating circumstances such as visits or telephone calls with relatives, as occurred in Carter, which might have purged or attenuated the illegal detention. In fact, the defendant did not speak with his mother until after he had made the confession. Accordingly, this factor weighs in favor of suppression of the confession.

As for why the defendant was arrested and held for nearly five days before being charged, Sergeant Dickerson testified that he had "conferred with an AG about the case, and we had other witnesses that we had to obtain statements from." Later in his testimony, he amplified his explanation by saying that, after the rape, the victim had been taken to a hospital and then to a nursing home, and he had trouble locating her and two other witnesses.

In this regard, we note that according to the handwritten signatures and dates on the defendant's photograph, he was identified by the victim on August 4, 1998, at 2:30 p.m., and by the victim's neighbor, Michael C. Davis, on August 8, 1998, at 1:20 p.m. Thus, the defendant having been identified by the victim prior to his being arrested, it would appear that probable cause existed for the arrest, although the strength of the photograph identification may have been questionable, given the victim's explanation at trial.

In weighing the applicable factors, we will review the manners in which our supreme court performed the same task in the similar cases of Huddleston and Carter.

In Huddleston, the only factor favoring admission of the defendant's statement was the fact that he had been advised of his rights prior to the interview. Favoring suppression of the statement were the facts that the statement was given approximately seventy-two hours after the arrest, the absence of attenuating circumstances, and that the arresting officer, believing that he did not have sufficient evidence to obtain a warrant, elected to hold the defendant in jail in order to further investigate the matter. Weighing these factors, the court determined that the confession was obtained in violation of the defendant's Fourth Amendment rights and should be suppressed.

In Carter, weighing against suppression were the facts that the defendant had been advised of his rights both when he was arrested and prior to giving the confession; had both met in jail with relatives and been allowed unrestricted telephone calls prior to giving the statement; and probable cause existed for the initial warrantless arrest, with no indication that the detention was for the purpose of additional investigation. The only factor favoring suppression was the fact that the

confession was obtained after seventy-two hours of detention, probable cause for the arrest not having been determined by a magistrate. Considering these factors, our supreme court determined that although the defendant was held in violation of the Fourth Amendment, the confession was not the product of an unlawful detention.

In the instant case, the only factor which clearly would favor admission of the statement is that the defendant was advised of his rights both prior to his initial statement of denial and to his confession. We also note that, arguably, probable cause would have existed for the arrest, based upon the victim's identification of a photograph of the defendant, although the strength of that identification is challenged by the defense. Although the defendant, himself, initiated the confession as a search warrant was being served on him for the taking of bodily fluids for DNA analysis, this is not one of the enumerated factors in determining whether a confession must be suppressed because of a Fourth Amendment violation. Thus, making an analysis like those in Huddleston and Carter, we conclude that the defendant's confession should have been suppressed by the trial court. We will review the additional claims of error by the defendant before determining whether the error in allowing the jury to hear the defendant's confession must result in reversal of the conviction.

### B.  Hair and Bodily Fluid Samples from Defendant

The defendant also argues that because of his being jailed in violation of his Fourth Amendment rights, the taking of hair and bodily fluids from him pursuant to a search warrant was illegal, and the results should have been suppressed. He does not dispute that the search warrant established probable cause for the taking of such samples from him. Citing Davis v. Mississippi, 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969), the defendant argues that the DNA evidence was a "fruit" of his illegal detention. However, in Davis, the defendant had objected to his fingerprints being matched to latent fingerprints left at the crime scene when he and approximately twenty-three others had been taken into custody, without probable cause, where they were fingerprinted and briefly questioned. Those circumstances differ greatly from the chronology in this matter.

In the instant case, the victim had identified the defendant, according to the date on his photograph, the day before he was taken into custody. After he had refused to provide, voluntarily, samples of his bodily fluids, police obtained a search warrant, the validity of which is not questioned, the warrant not appearing to rely upon anything that had occurred during the unlawful detention to establish probable cause. Accordingly, we conclude that although there was a temporal relationship between the illegal arrest and the execution of the search warrant for bodily fluids, the connection, if any, between the detention and the probable cause for the search warrant was "so attenuated as to dissipate the taint." Segura v. United States, 468 U.S. 796, 805, 104 S. Ct. 3380, 3385, 82 L. Ed. 2d 599 (1984) (quoting Nardone v. United States, 308 U.S. 338, 341, 60 S. Ct. 266, 268, 84 L. Ed. 307 (1939)); see also United States v. Ponce, 947 F.2d 646, 651 (2nd Cir. 1991) ("[A]pparently illegal detention of defendants did not taint the subsequent search because the police later obtained a valid search warrant.").

Thus, we conclude that the obtaining of the defendant's bodily fluids pursuant to a valid search warrant was neither the "fruit" of, nor tainted by, the illegal detention. Accordingly, we find no error in admission of the DNA evidence.

## II. Admissibility of MSARC Records as Business Records

The defendant argues that the trial court erred in allowing admission of records of the MSARC as business records. We will now consider that claim.

Rule 803(6) of the Tennessee Rules of Evidence provides:

> Records of Regularly Conducted Activity. - A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used on this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

Two objections were presented by the defendant to the entry of MSARC records as business records. The first was that Forensic Nurse Examiner Sally DiScenza was not the "keeper" of the records. However, Rule 803(6) does not impose that requirement, as explained by Neil P. Cohen et al., Tennessee Law of Evidence, § 8.11[11] (4th ed. 2000) (footnotes omitted), in pertinent part:

> Rule 803(6) simply provides that the witness be the records "custodian or other qualified witness." Typically that witness will be in charge of maintaining records of the particular business, but other employees or officers or appropriately informed witnesses could be used as well. The key is that the witness have knowledge of the method of preparing and preserving the records. If no witness is available to testify, the records cannot be authenticated as business records, unless the parties stipulate to authentication.

Based upon Ms. DiScenza's duties and experience, we conclude that she was a "custodian or other qualified witness" and, as such, qualified to testify as to the business records.

Additionally, the defendant contends that even if the MSARC records are "business records," they cannot come within the Rule 803(6) hearsay exception because they were prepared for the purpose of litigation. We disagree with this argument. The distinction between records prepared in the normal course of business, as were the MSARC records about which testimony was given, and records used only incidentally in litigation, as opposed to being prepared for it, was explained by Neil P. Cohen et al., Tennessee Law of Evidence, § 8.11[6] (4th ed. 2000):

> In order to have sufficient indicia of trustworthiness to qualify as a business record under Rule 803(6), the record must have been made in the "regular practice of that business activity," and it must have been "kept in the course of a regularly conducted business activity." An extraordinary report prepared for an irregular purpose, particularly when prepared with litigation in mind, may not be made in the regular course of business and may be inadmissible as a business record under Rule 803(6). On the other hand, an investigative accident report compiled by a business as a routine matter should not be excluded solely because litigation sometimes ensues following an accident.

The testimony established that MSARC records were made in the regular course of the Center's business, although, obviously, such records might be used in legal proceedings. However, that possibility did not mean that the records were "dripping with motivations to misrepresent," Hoffman v. Palmer, 129 F.2d 976, 991 (2nd Cir. 1942), as might have been the case had they been prepared specifically for use in litigation. Accordingly, we conclude that the MSARC records were admissible as business records. See State v. Goldston, 29 S.W.3d 537, 540-42 (Tenn. Crim. App. 1999) (holding that records of Bradley Memorial Hospital and Erlanger Medical Center of defendant's blood tests were admissible as business records for prosecution of defendant for DUI).

### III. Chain of Custody of DNA Evidence

We will next examine the defendant's claim that the evidence was insufficient to establish the chain of custody to permit admission of the DNA evidence. Our supreme court explained the necessity and purpose of such proof:

> As required by Rule of Evidence 901(a), it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998); see also, e.g., State v. Cameron, 909 S.W.2d 836, 850 (Tenn. Crim. App. 1995). The purpose of the chain of custody requirement is "to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." See State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993).

> The identity of tangible evidence, however, need not be proven beyond all possibility of doubt, see State v. Holloman, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992), and the State is not required to establish facts which exclude every possibility of tampering, see State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). The evidence may be admitted when the circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity. Holloman, 835 S.W.2d at 46. Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Neil P. Cohen, et al., Tennessee Law of Evidence § 901.12, at 624 (3d ed. 1995).

State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000).

To assess the defendant's claim, we will review the evidence from the taking of samples from the victim and the drawing of blood samples from the defendant to the testing of the samples at the TBI Laboratory in Nashville, which was the final destination in the chain. Sandra Anderson, a sexual assault nurse examiner with the MSARC, testified that she had collected vaginal and oral swabs, a blood standard, and pubic hairs from the victim, which she put in a rape kit and placed in a locked storage area at the MSARC.

Sergeant Dickerson testified that he was present when samples of blood were drawn from the defendant and placed into one or two vials by an employee from the MSARC. The person who drew the samples did not testify. Dickerson said that the employee who took the samples from the defendant also took his photograph and thumbprint, and placed on the vial(s) an adhesive label with "the necessary information."

Sally DiScenza, a forensic nurse examiner with the MSARC, testified that her office keeps records regarding the drawing of blood samples from suspects, the Center being under a duty to do so, and the records being made near the time the blood is drawn. According to their records, the blood samples from the defendant were drawn by their former employee, Jo Jones, who had since retired, and were received at the Center by "L. Henderson," who was not called to testify.

DiScenza testified that the Center's standard procedure, when asked to draw blood from a suspect, was to use a vacutainer, which would automatically move the blood from the sterile needle in the suspect's arm into a sterile tube. A sterile needle would then be used to withdraw blood from the tube and put it onto a blood standard. She said that samples are put into envelopes, upon which are written the suspect's name, the date and time the blood was collected, and the signature of the nurse-clinician who performed the tasks. As an additional safeguard, at the time the samples are drawn, a photograph is taken of the suspect, and he is fingerprinted.

-13-

DiScenza was familiar with and identified the signature of Jones, but was unable to identify that of Henderson, with which she was not familiar. The file contained a photograph bearing the initials "J.J." and the date August 10, 1998. The photograph bore the name "A. Dean," the number 98-0030, and two fingerprints, one in red and the other one in black. Although not made an exhibit, the photograph was shown to the jury. On the same page as the photograph, the file bore the MSARC number 98-0030, a notation that the sample was collected on August 10, 1998, at 2:00 p.m., and the suspect's name, Anthony Dean, age 37, date of birth September 25, 1959, as well as Memphis Police Department number 980800107. The Center's records showed that the samples from the defendant, consisting of "[a] dried blood standard, a pubic hair combing, and head hair sample, as well as a saliva standard" were sent to the TBI Laboratory in Nashville. The victim's vaginal swabs and blood standard were sent to the TBI Laboratory in Jackson. Until shipment, specimens from the defendant were kept in a locked evidence room. She said that the samples were kept under case number 980800107.

DiScenza testified that the Center's procedure did not permit any items to be removed from a file, or for files to be checked out. She said that all of their files contain exactly the same sort of information and have the same number of pages. The defendant's file, about which she was testifying, contained the standard contents.

Steven Wiechman testified that he received MSARC sealed sample kit 980800107 which, after testing, was delivered to the TBI Laboratory in Nashville under the same number as received in Jackson. He testified that "there was also a second kit from the subject that contained a blood standard in that," and he sent this kit as well to the TBI Laboratory in Nashville. He said that Loren Henderson had brought the evidence from Memphis to Jackson.

Agent Raymond DePriest, of the Nashville TBI Laboratory, testified that he received a sealed envelope from the TBI evidence vault on October 20, 1998, and began DNA profiling on the contents on November 19, 1998. He stated that he had received a "swatch," which consisted of a "piece of sterile cotton" with a bloodstain from the victim, as well as a swatch with a blood standard from the defendant. Additionally, he received vaginal and vulvar swab samples from the victim. According to the witness, the DNA profile of the blood swatch of the defendant matched the DNA profile of the sperm fraction of the vaginal swab from the victim.

Because the need for our ascertaining the sufficiency of the chain of custody proof is affected by whether the defendant made a timely objection to such evidence, we will first consider the procedural issue, that is, whether the defendant's chain of custody objection was timely. To put the defendant's objection into the proper context, we will review its timing.

Agent DePriest testified as the State's final witness on Wednesday, February 2, 2000. The following morning, before the State had rested, the defense argued that the State had made an insufficient showing as to the chain of custody, and asked that the court instruct the jury to disregard the DNA proof. After the trial court declined to do so, the defense then asked that a mistrial be

declared, which the trial court also declined to do. The trial court later concluded that the defendant had waived his right to object to the chain of custody by not objecting timely:

> Okay. The analysis that I'm making is, had there been an objection, and I don't know what my ruling would've been, but I'll be honest with you, with all due respect to [the prosecutor's] analysis, I'm not a hundred percent satisfied the chain of custody was proven. But there was no objection. The testimony was that these things were done. The testimony was that these witnesses received them, and that they conducted their tests on them. That's what's in front of the jury.
>
> And it's my position that I'm not going to come along after the fact and say, well, there was no objection to it, and after the fact I'm going to rule that it's not admissible evidence. It's already admitted, it's already in front [of] the jury, it's already evidence. And as far as I'm concerned it's proper evidence to be considered by the jury at this point.

Although not denominated as such, in arguing that the State's chain of custody proof was deficient, defense counsel, in effect, was presenting a motion to strike, the function and purpose of which is explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 1.03[4][c] (4th ed. 2000):

> Although on most occasions an objection rather than a motion to strike is used, Rule 103(a)(1) sometimes dictates the latter procedure. A motion to strike, which is essentially a delayed objection, is used frequently when evidence has been conditionally admitted, and the condition is not later fulfilled. This motion should be made by counsel opposing the evidence. A motion to strike is also appropriate any time inadmissible evidence has been heard by the trier of fact. It may be accompanied by a request for a jury instruction to ignore the evidence.

That "a motion to strike may properly be made at any time prior to the formal closing of the evidentiary record and the final resting of the case by all parties" was explained in State v. Pilkey, 776 S.W.2d 943, 952 (Tenn. 1989), which further stated:

> Nothing in either the rules of civil or criminal procedure was ever intended to eliminate the trial motion to strike evidence from the record or to withdraw it from consideration by a jury. Sometimes it can serve as a late objection or a renewed objection, or it can serve to strike evidence which had previously been conditionally admitted when the condition has not later been met. The motion is expressly

-15-

retained and recognized in the new rules of evidence, T.R.E. 103(a), as follows:

Effect of erroneous ruling--Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected, and

(1) Objection.--In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context . . .

Although counsel did not characterize her objection in the present case as a motion to strike, it had the same effect, and the issue was not waived simply because the motion was made after the evidence had been introduced.

Id. at 953.

Based upon these authorities, we conclude that the defendant made a timely objection to the State's chain of custody proof.

Sergeant Dickerson testified that he observed Jo Jones of the MSARC draw blood from the defendant, placing the blood into one or two vials. Jones then placed labels on which she had written certain information onto the vial(s).

Additionally, although the record is not completely clear, DiScenza said that the items from the defendant, including the dried blood standard, were sent from the Center to the TBI Laboratory in Nashville. TBI Agent DePriest from the Nashville Laboratory testified that the card, ostensibly with a sample of the defendant's dried blood, had the initials "SRW," these being the initials of Steven Wiechman of the Jackson TBI Laboratory, who testified that his laboratory had received the sealed MSARC package containing samples from the victim and the defendant.

Agent DePriest said that he had received the evidence in a sealed envelope, bearing agency number 980800107. It was then given TBI number 98112128. Regarding the effect on his testing if the samples had been contaminated, he said that it would have resulted in no DNA being present. Further, he said that if the samples had been "treated inappropriately," he would not have been able to get a DNA profile.

The nature of the proof needed to establish the chain of custody as to a sensitive sample was explained in State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000):

The appellant maintains that the State failed to properly establish the chain of custody of the hairs removed from the victim because the State could introduce no proof of how the hairs were mounted on the glass slides for examination. At trial, the State introduced evidence establishing most of the links in the chain of custody. For example, the nurse practitioner who examined the victim testified that she placed all of these hairs collected from the victim into a single envelope. A police detective, Steve Kleek, then testified that he took the victim's rape kit with the hairs to the Tennessee Bureau of Investigation for analysis and that he later regained custody of the hairs from the TBI.

Detective Kleek also testified that he was responsible for sending the hairs to the FBI for DNA analysis, and prior to sending the hairs to the FBI, the detective noted that only two hairs were contained in the envelope. When the FBI returned the hairs to detective Kleek, however, he noted that two hairs were now mounted on glass slides for use in a microscope. The detective testified that he then sent the mounted hairs for analysis to LabCorp, who confirmed that the hairs were already mounted on slides when they were received.

Our supreme court, in Scott, concluded that the State had failed to prove the chain of custody, explaining the deficiencies in the proof:

The hairs were not identified by a witness with knowledge that the mounted hair samples were the same hairs as the ones originally taken from the victim. Further, we can find no evidence whatsoever to show how the hairs came to be mounted on the slides. We also can find no evidence to show who mounted the hairs on the slides or whether the hairs were mounted in a manner sufficiently free of contamination or alteration. Although the hairs were apparently mounted on glass slides by someone with the FBI, no one was able to establish this important "link" in the chain of custody. Without this knowledge, it is impossible to know whether anyone tampered with the evidence, or whether anyone had the opportunity to "confuse, misplace, damage, substitute, lose, [or] replace" the hairs at issue. Cf. Cohen, et al., Tennessee Law of Evidence at 623-24. Because reasonable people cannot disagree that the State failed to establish this important "link" in the chain, we find that the trial court erred in admitting the analysis of the hair samples without reasonably establishing their identity and integrity. See Tenn. R. Evid. 901(a).

33 S.W.3d at 761 (footnote omitted).

In the instant case, the MSARC procedure was for Jo Jones, who drew the defendant's blood, to prepare the sample on the sterile gauze, which was contained within the MSARC file. She did not testify. However, there was no proof that the preparation of the dried sample of the defendant's blood was as sensitive a procedure as was the making of the slide in Scott, where a mitochondrial DNA analysis had been made. According to Scott, "mtDNA samples are hypersensitive to contamination, and the particular method of storing and mounting the hairs could very well compromise the test results." Id. at 761 n.13. Thus, with this distinction, and based upon the proof presented, we conclude that the "circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity." Id. at 760 (citing State v. Holloman, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992)). Although the defendant stressed at trial and on appeal possibilities of tampering and contamination, there was no showing that this occurred. Rather, the State presented minimal but adequate "proof that the evidence was handled according to normal procedures and that there [was] no indicia of tampering." Neil P. Cohen et al., Tennessee Law of Evidence, § 901[13][f] (4th ed. 2000). Accordingly, we conclude that the State proved the chain of custody and that, as a result, admission of the DNA results was not error.

### IV.  Effect of Erroneous Admission of Confession

As an issue on appeal, the defendant contends that the cumulative effect of the erroneous admission of his confession and of the DNA evidence requires reversal of the conviction. However, having concluded that only the confession was admitted in error, we will now determine whether, in light of that, the conviction can stand.

In Momon v. State, 18 S.W.3d 152, 163-65 (Tenn. 1999), our supreme court explained the application of the harmless error doctrine to constitutional violations occurring during a criminal trial:

> In Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), the United States Supreme Court rejected the proposition that all federal constitutional errors that occur in the course of a criminal trial require reversal. The Chapman Court held that the Fifth Amendment violation of prosecutorial comment upon the defendant's failure to testify would not require reversal of a conviction if the State could show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 24, 87 S. Ct. at 828. The Chapman standard recognizes that "certain constitutional errors, no less than other errors, may have been 'harmless' in terms of their effect on the factfinding process at trial." Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986).

> Since Chapman, the Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if

the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Id.

In this case, there was substantial evidence, in addition to the defendant's confession, upon which the jury could find the defendant was guilty. He was identified, as has been set out, by both the victim and her neighbor, Michael Carl Davis, the victim saying that the defendant was the man who had raped her, and detailing her previous experience when he had come into her apartment asking to cut her hair. Davis, who lived directly above the victim, testified that, during the early morning hours shortly before the victim was raped, the defendant had come into his apartment without permission. The DNA evidence established that there was a one in forty-one quadrillion chance that a person other than the defendant had deposited the semen found on the vaginal swabs from the victim following the rape. From all of this, we conclude beyond a reasonable doubt that the erroneous admission of the defendant's confession did not affect the verdict.[2]

## V. Sufficiency of the Evidence

The defendant argues that the evidence adduced at trial was insufficient to convict him of the aggravated rape of the victim. Recognizing the standards by which we measure the sufficiency of the evidence, he contends that a careful analysis will show the insufficiency of the proof of identification of him as the perpetrator.

In assessing the sufficiency of the evidence, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

---

[2]In State v. Larico S. Ficklin, No. W2000-01534-CCA-R3-CD, 2001 WL 1011470 (Tenn. Crim. App. Aug. 27, 2001), the defendant had been arrested without probable cause, and held without a subsequent judicial determination of probable cause. His confession, given fifty-three hours after his initial detention, was determined by this court to be the product of his illegal seizure and detention. There, unlike in this matter, the additional evidence against the defendant was "circumstantial and certainly not overwhelming," resulting in the court's reversing the conviction and remanding the matter for a new trial. Id. at *10.

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As set out in the recitation of the testimony, evidence was presented showing that the defendant was living, apparently on a temporary basis, in the same high-rise apartment building as the victim. An entry card, which the defendant had, was necessary to enter the building. By utilizing a common ledge which protruded from the balconies of the apartments, a person could enter the victim's bedroom door, which the intruder used, from the stairwell. Michael Carl Davis testified that the defendant had entered his apartment, nearby that of the victim, shortly before the victim was raped. He further testified that the defendant had earlier come to his apartment asking to cut his hair. The victim testified that the man who had raped her was the same man who had previously come to her apartment asking to cut her hair. Additional testimony was that the blood drawn from the defendant matched the semen sample taken from the victim. The victim identified the defendant in the courtroom as the man who had raped her, and was questioned in detail about her earlier identifying a photograph of the defendant and her identifying a person other than the defendant at the preliminary hearing. Thus, we conclude that there was sufficient proof as to identity, see State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998), and that the evidence was sufficient to support the conviction.

## VI. Sentencing

As his final issue, the defendant argues that in sentencing him to the maximum sentence of forty years, the trial court misapplied enhancement factors. Because the parties disagree as to which factors were applied by the trial court, we will set out the statement of the trial court in sentencing the defendant.

In sentencing the defendant, the trial court stated:

THE COURT: All right. This is indictment 98-14047, State versus Anthony Dean. Mr. Dean was convicted by a jury of the offense of aggravated rape, which is a Class A felony. Based upon the proof that's been presented to the court via the presentence report, the court

finds that Mr. Dean has previously been convicted of two prior Class C felonies. One indictment number 92-11129 for the offense of robbery. The other in indictment number 92-11113. He was convicted of the offense of aggravated burglary. Both of those offenses are a Class C felony. A Class C felony being two grades less than the offense of aggravated rape, which is a Class A felony. The defendant, therefore, would qualify as a Range II multiple offender. With regard to the – so he's not a – it's a Range II multiple offender for purposes of sentencing. It's a violent offense. So there's no release eligibility or parole involved in this offense.

With regard to the enhancement factors found in 40-35-114, factor number one, that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate Range. The court finds that that is an enhancement factor to be considered. Again, the presentence report speaks for itself and will be a part of the record. But the court notes one, two, three, four, five, six, seven, eight, nine, at least nine prior misdemeanor convictions. Two prior Class E felonies convictions in addition to the two felony convictions which have caused Mr. Dean to be a Range II offender.

Further, the court finds that based on the proof in this case, Mr. Dean was identified as having committed as, the best description, an aggravated burglary into the house or the apartment of, I believe it was a Mr. Davis, Michael Davis on the same night in question. The testimony from Mr. Davis was that he was awakened in the middle of the night by Mr. Dean being in his apartment.

The criminal behavior, I don't know that I could classify that testimony enough to call that an aggravated burglary. There's no proof of any felony to be committed or intent to commit. Because I don't recall Mr. Davis testifying that he was missing anything or anything had occurred. Simply that Mr. Dean awakened him in the middle of the night in his apartment. But that would constitute in my mind criminal behavior. So, based upon the record that's been presented to the court and the testimony that's been presented in the trial, the court finds and will put a great deal of emphasis on the fact that Mr. Dean has a long history of criminal behavior and criminal convictions in addition to those necessary to establish the appropriate Range.

I find factor[s] two and three are not applicable in this case.

-21-

Factor number four, that the victim of the offense was particularly vulnerable because of her age or physical or mental disability. I don't find any physical or mental disability in this lady. Quite to the contrary. I find that – I think it was [the victim]. From a mental standpoint I find this lady to, frankly, when she testified she was 93 years old. I only hope that my mental faculties are as good as her's [sic] are when I'm 93 years old. But I will add and I will state for the record that her physical appearance was that of a, obviously, a 93 year old lady when she testified. She was small in stature. The court would estimate five feet to five feet two inches, possibly. Frail for her age. Or I won't say for her age, but a frail lady. And because of that, I think there are factors to be considered. And I think the legislature spelled out when they set this – I don't think that the fact that she has a sharp mind or that she's capable of crying out necessarily excludes this. Just as if the fact that the courts discussed when they discussed the age of a child. Obviously, a two or three year old child doesn't have that capability to cry out or to – I guess, they could cry out – but to summon help or to make identifications or testify. I think the court and the legislature was looking at those. But I don't think that's the only thing that the legislature was looking at. And I don't think that's the only thing the courts look at. Based on the testimony that this court heard in this trial, Mr. Dean went in [the victim's] apartment earlier that same day. So it was obvious this was not a random selection of [the victim's] apartment and [the victim] as a victim in this case. Mr. Dean had been in her apartment that day, had talked with her, had visited with her. So Mr. Dean was obviously aware of her physical size, her physical ability, her age. And I don't think there's anything in this record to indicate that Mr. Dean had anything other than rape on his mind. The testimony that the court heard was that he came in, dragged her and threw her back in the bed, searched the room for some kind of lubricant and finally wound up using some kind of hair creme or hair tonic as a lubricant to penetrate this lady.

So in the court's mind based on the proof that was presented, Mr. Dean went there with the intent to rape her. And I can't help but look at her size, the frail nature of her size, her age, obviously, and say that Mr. Dean was just as aware of her age and her susceptibility to being manhandled and controlled by him. So I do find, based on the proof that's presented in this case, that [the victim] was particularly vulnerable because of her age. And her physical or her lack of ability to fight off an individual such as Mr. Dean at her age and in the condition that she was in. I do find and I do think the courts and the

legislature had in mind that – not simply because of age, but because of the overall facts and circumstances of the case, that she was particularly vulnerable. She lived alone. She was elderly. And I think Mr. Dean knew that and used that as a factor in picking his victim out. And I think the courts or the legislature thinks that that's a factor that the courts should use in sentencing, above and beyond and not to belittle in any way any rape victim. But above and beyond – and I don't know that you can use the term a normal rape victim. I don't think that – that's probably a poor choice of words. But I feel that this is a proper case where the enhancement factor based on the victim's age and physical characteristics because of her age, should be considered by the court. And I intend to use that as an enhancement factor.

Factor number five that the victim was treated with exceptional cruelty during the commission of the offense. The court accepts the fact that there has to be some proof of bodily injury. And that kind of flows into number six as well. The personal injuries inflicted on the victim were particularly great. Those two in my mind in this particular case have to flow together somewhat. The testimony, as I recall it – and, again, the record will speak for itself – the testimony, as I recall it, was that [the victim] was grabbed by her hair and by one of her legs and tossed back onto the bed by Mr. Dean. And, again, that reiterates her size and her physical ability to fight off an individual by the presentence report. Mr. Dean is approximately six feet one inches [sic] tall and weighs 160 pounds. I don't even have an estimate of [the victim's] weight. But I dare say that it would not exceed 100 or 110 pounds. But that, again, that's my observation. That she was tossed – and I don't recall if that was her testimony or her choice of words or my choice of words – but back onto the bed after she attempted to get up. That Mr. Dean, as delicately as I know how to place this, my recollection of [the victim's] testimony was that Mr. Dean is an extremely well-endowed man. [The victim's] testimony, and I believe I recall her testimony that she's a retired nurse, was that she doesn't think she's ever seen anybody with the physical characteristics of Mr. Dean. And that, again, he was unable to penetrate her. He looked around the room to find a lubricant to try to assist him. He attempted to penetrate her anally. That when he did penetrate her vaginally, because of his size, according to [the victim], she felt like she was exploding inside. It completely tore up her womb. But, further, she indicated that in order to penetrate her it was necessary for Mr. Dean to take her leg, a leg of a 90 year old woman, put it up over his shoulder and in an extremely awkward position for

this lady in order to penetrate her. And as a result, she suffered some permanent injuries to her hip.[3] That she was not, in fact, having those types of problems before this. That she remained in the hospital for several days after this rape occurred.

Because of the way in which she was treated, this court finds that she was treated with exceptional cruelty by Mr. Dean. And, again, it goes back to my interpretation of the facts as I saw them. And that is that there was nothing else on Mr. Dean's mind other than sexual gratification. He went to this apartment with one thing on his mind, that's apparent to the court, and he accomplished that one thing. And [the victim], who he had previously met and seen, was unable to fending [sic] him off in any form or fashion. And Mr. Dean knew that when he went in that apartment.

I do find that the injuries that were inflicted to her were particularly great. However, I am not going to – I find that that is an enhancement factor that's present, but I'm not going to put a great deal of emphasis on factor number six. I am going to put some emphasis, not as much as some of the others, but on the fact that she was treated with exceptional cruelty.

I find factor number seven not to be appropriate in this case. I do not find that there's anything to indicate that Mr. Dean had anything on his mind other than sex. And, obviously, the desire for pleasure or excitement the courts have told us can be, and there's nothing to indicate to me anything to the contrary, are a part of the offense of aggravated rape. So I find that there's nothing that the court can rely on to show that factor number seven is appropriate. So I find that that is not an appropriate factor.

Mr. Dean has a previous history of unwillingness to comply with the condition of a sentence involving release in the community. Again, as evidenced by Exhibit one, the presentence report, he has been charged with parole violation back in 1994. So the answer to that factor would be yes.

Factor number nine is not appropriate in this case. The defendant had no hesitation about committing a crime when the risk to human life was high. Normally I would say that that's not an appropriate factor for an aggravated rape case. Because I think that

---

[3]We have been unable to find a reference in the record regarding injuries to the victim's hip.

the potential for – obviously you must have bodily injury in order to have an aggravated rape. And, therefore, incorporated in bodily injury I think the court could conclude that there has to be a risk to human life involved. And I think the general nature of aggravated rape would lend itself to that allegation. However, again, this case being unique simply because of the fact that this was not a random act by Mr. Dean. This was a thought-out, planned assault on this lady. Again, Mr. Dean was aware of her age, her frailty, the fact that she lived alone. And, obviously, he had no hesitation about committing this crime knowing that an assault and an attack on a 90 year old woman could run the risk of costing her her life or some serious injury.

I just think that the unique facts of this case because of the victim's age, this has to be a factor to be considered. I'm not exactly sure of the interpretation of the Court of Criminal Appeals or the Supreme Court with regard to this element. I find it's apparent and appropriate in this case, but I'm not going to put a great deal of emphasis on it simply because there is some question as to whether or not it's merged with the allegations of aggravated rape.

I find that none of the other factors listed under 40-35-114 were appropriate. I don't find that the crime was committed under circumstances under which the potential for bodily injury to the victim was great. Obviously you must have bodily injury to have an aggravated rape. So that factor is included.

As to any mitigating factors, the court finds none. Based on the presentence report, based on the testimony that I've heard, I find no factors to mitigate this. This is not a crime that involves probation. So probation is not a factor to be considered. This presentence report was requested. It's required by law. I've read my reasons into the record or the enhancement factors that I've found. I've given Mr. Dean an opportunity to speak. He has waived that right.

Therefore, the court feels under the guidelines that have been set out, this is a Class A felony, which is a violent offense, it's non-parolable. The presumptive beginning Range for purposes of sentencing as a Range II offender for a Class A felony, the Range is 25 to 40 years. The presumptive beginning place for a violent offense and a Class A offense is the mid-Range within that. So that I assume it would be approximately 32, 32 ½ years. The starting point under the law, the court is to enhance using enhancement factors to increase

the punishment and then any mitigators to reduce it back down. Since the court finds there are no mitigators in this case, the court is going to put a great deal of emphasis on Mr. Dean's history of criminal convictions and criminal behavior. The vulnerability of the victim in this case, the fact that she was treated with exceptional cruelty and the fact that Mr. Dean has previously been on parole and has violated that parole. Those are the factors the court is going to consider with a great deal of emphasis on his record and the vulnerability of [the victim]. Based on Mr. Dean's scoping out the scene and selecting her intentionally as his victim in this case.

The court, therefore, is going to impose a sentence of 40 years as a Range II offender, a violent offender with no parole.

MR. WHARTON: Thank you, Your Honor. Could we get a date for our new trial motion?

THE COURT: Yes, sir. Let me add, again, for the record because I intended to do this earlier when we were discussing the definitions of bodily injury. Bodily injury is required by the aggravated rape statute. It calls for a cut – or includes a cut, abrasions, bruise, burn or disfigurement, physical pain or temporary illness or impairment of the function of a bodily member. The distinction there being temporary. Serious bodily injury calls for a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement or protracted loss or substantial impairment of a function of a bodily member or mental faculties. With regard to the injuries that [the victim] sustained, this court finds the distinction between bodily injury and serious injury is found in this case. I don't find that the injuries inflicted upon [the victim] were simply bodily injury. I think they were serious bodily injury above that necessary to cause an aggravated rape, that the injuries that she suffered were above and beyond that that was needed to constitute Mr. Dean's acts upon her. And for those reasons, again, I reiterate the court's findings with regard to the fact that she was treated with exceptional cruelty and that the injuries inflicted upon her were particularly great. Because I think that they amounted to serious bodily injury not simply bodily injury as called for by the statute.

Based upon these statements by the trial court, the defendant argues that the trial court applied enhancement factors (1), (4), (5), (6), (8), and (10). See Tenn. Code Ann. § 40-35-114(1), (4), (5), (6), (8), & (10). The State responds that, of these factors, the trial court did not apply (6) and (10). Based upon our review of the sentencing, we conclude that the defendant's interpretation

-26-

is correct as to the factors applied, although little weight was given to factors (6) and (10). The defendant contends that only factor (1) was applicable, while the State argues that the trial court was correct in applying the factors which it did. In view of this dispute, we will review the sentence imposed by the trial court.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103 and -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentences are erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentences imposed by the trial court are erroneous.

Concluding that the trial court "considered the sentencing principles and all relevant facts and circumstances," we will now determine whether the enhancement factors upon which the trial court relied were applicable.

## A. Enhancement Factor (1)

The parties agree that the trial court was correct in applying factor (1), that the defendant had a previous history of criminal convictions or criminal behavior. Tenn. Code Ann. § 40-35-114(1). He had previous convictions for robbery and aggravated burglary, both Class C felonies. Additionally, he had two Class E felony convictions and approximately ten misdemeanor convictions. Thus, we conclude that factor (1), to which the trial court gave great weight, was applicable.

## B. Enhancement Factor (4)

The trial court applied factor (4), that the victim, who was nearly 90 years old at the time of the rape, was particularly vulnerable, see Tenn. Code Ann. § 40-35-114(4), because she was small, frail, lived alone, and the defendant had selected her as his victim for these reasons. The defendant argues that this factor was not applicable because the State did not prove that the victim's age or physical or mental limitations affected her ability to resist the crime, to summon help, testify in court, or that her vulnerability was a factor in the offense.

Enhancement factor (4) may be applied when the facts show that the "victim of the offense was particularly vulnerable because of age or physical or mental disability, . . . ." Tenn. Code Ann. § 40-35-114(4) (1997). Our supreme court, in State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993), concluded that enhancement factor (4) "relates more to the natural physical and mental limitations of the victim than merely to the victim's age." Id. Thus, the Adams court found that factor (4) could be used in an aggravated rape case of a child under the age of thirteen, even though the age of the child is an essential element of the crime, "if the circumstances show that the victim, because of his age or physical or mental condition, was in fact 'particularly vulnerable,' i.e., incapable of resisting, summoning help, or testifying against the perpetrator." Id.

In State v. Poole, 945 S.W.2d 93, 96-97 (Tenn. 1997), our supreme court explained the application of this factor:

> In determining whether the State has met its burden, the trial court must consider a number of factors and must make factual findings. It should consider whether evidence in the record with regard to the victim's age or physical and mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date. See e.g., State v. Clabo, 905 S.W.2d 197 (Tenn. Crim. App. 1995) (factor properly applied where child victim of sexual offense suffered from learning disability); State v. Buckmeir, 902 S.W.2d 418 (Tenn. Crim. App. 1995) (factor proper where defendant knew victim had "passed out" from drinking and was unable to resist the commission of a sexual offense); State v. McKnight, 900 S.W.2d 36 (Tenn. Crim. App. 1994) (factor properly applied where victims of sexual acts were very young, lacked family support, and looked to defendant for friendship and approval). . . . The evidence need not be extensive and additional weight may be given to the age of the victim in those cases where a victim is extremely young or old. Nonetheless, the State must prove the factor is applicable and there must be evidence in the record in addition to the victim's age.

Here, the proof showed that the victim, who lived alone, was within two weeks of her ninetieth birthday at the time of the rape. She had an artificial knee, and was in a wheelchair at the

time of the preliminary hearing. At time of trial, she was ninety-two and one-half years old and said that she was "weak" and that her body was "giving out." Based upon this, we cannot conclude that the trial court erred in finding that the victim was particularly vulnerable.

## C. Enhancement Factors (5) and (6)

Because of the relationship between factor (5), that the victim was treated with exceptional cruelty, and factor (6), that the injuries to the victim were particularly great, see Tenn. Code Ann. § 40-35-114(5) & (6), we will consider these factors together, especially for the purpose of setting out applicable testimony. The victim testified as to the details of the attack:

> Q. So this person came in and grabbed you by the neck[?]
>
> A. Grabbed me by the neck and never turned my neck aloose [sic] until they couldn't do what they came in to do. And they were hunting for some medication to put on their body to make their body useful. And I got off the bed, and went to the front, and went around in the kitchen to get me some water in a cup. And the cup was sitting there in the bathroom when the police came.
>
> And when I turned around, he was right at my shoulder, following me around. And I – and pulled me on back to the bedroom. And caught me by the ball of hair and by this leg. See this leg has an artificial knee in it and this leg, caught me by this leg and threw me up over the foot, straight up to the pillow on my bed.
>
> Q. All right. And I'm sorry again to have to go through this with you but what did he do then?
>
> A. And went to – went back to attempting to rape me, to have whatever pleasure they thought they'd get out of it. Took this leg and pulled it up over his shoulder and put his arm on it so I couldn't get it down, like you see the people on the stage doing the splits. That's the way my leg was. This leg was straight out and I was on the side but this leg was up over his shoulder. And – and he had his arm under there so I couldn't get it down. So it was nothing I could do.
>
> And he kept doing what – he tried both entrances, my rectum, my vagina. And I still have a little slight protrusion of – you know what you have when your rectum comes out, but I have always been the type of nursing service, I keep my rectum in with the treatments that I know to use. But there's always a little part that still sticks out.

Q.  All right.

A.  And then finally, I don't know if he tore it open or what happened, but he finally got that – that was the largest organ on a man I've ever seen or heard of in all of my 90 years.  Finally with my back to him, got it into my stomach – this – my womb now, my fractured ribs, and my – I have a rib up here that we thought was broken, got to the hospital, but all of these ribs were wounded on that side.

I was so roughly handled, they said when I got to the hospital I wouldn't live.  But my doctor knew me and I told him I would live.  So they went on and worked on me.

Q.  All right.

A.  This arm and this shoulder, when I touch that right now like that, it hurts as if though it was right now happening.  This whole side that helped me to get around with this artificial knee that had been planted in '91, now I have to have a walker or a walking stick to get around.  I've done pretty good coming out of it but I haven't got [sic] over it.

The trial court applied enhancement factor (5), finding that the victim was treated with exceptional cruelty because, in order to penetrate her vagina, the defendant put one of her legs over his shoulder, and that, because of this, she had permanent hip injuries.  The court did not state how much weight it was ascribing to this factor.

The proper application of factor (5) was explained by this court in State v. Spratt, 31 S.W.3d 587, 607 (Tenn. Crim. App. 2000):

Defendant challenges the application of enhancement factor (5), that Defendant treated the victim with exceptional cruelty during the commission of the offense.  We conclude that factor (5) was properly applied.  The Tennessee Supreme Court has stated that before this factor may be applied, the facts in the case must "support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime.  State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (citation omitted).  See also State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995) (holding that application of enhancement factor (5) "requires a finding of cruelty over and above that inherently attendant to the crime").  We conclude that Defendant's actions of striking the victim on the head with a beer bottle with such force to cause the bottle to shatter and then dragging the victim around the office by her hair

represents a culpability distinct from and appreciably greater than that incident to the offense.

Additionally, the trial court also applied factor (6), that the injuries to the victim were particularly great, although it did not give great weight to this factor.

In State v. Carico, 968 S.W.2d 280, 286 (Tenn. 1998), our supreme court explained that this factor cannot be applied in sentencing following a conviction for aggravated rape unless the victim "sustained appreciable personal injuries beyond those incidental to the crime . . . ." Here, the victim testified that the defendant held her by her hair and her leg and pulled her back into the bedroom. Attempting to penetrate her, he raised one of her legs and put it on his shoulder, holding it there with his arm. The victim likened it to being forced to do the splits. At the time of trial, approximately two and one-half years following the rape, she said that her arm and shoulder still "hurt[] as if though it was right now happening." Additionally, she said that an artificial knee had been implanted into her in 1991, and that since the rape, she had to use a walker or cane to get around. In view of the facts of the rape and the resulting disability of the elderly victim two years after it, we cannot conclude that the trial court erred in applying enhancement factors (5) and (6).

### D. Enhancement Factor (8)

This enhancement factor is applicable when "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Tenn. Code Ann. § 40-35-114(8). The defendant argues that this factor should not have been applied because the presentence report showed only that, in 1994, he had been arrested for an alleged parole violation, but that no disposition was shown. We agree. The applicable entry on the presentence report for September 27, 1994, states "violation of parole – held for parole board." Since no disposition was shown for this charge, we conclude that it should not have been applied.

### E. Enhancement Factor (10)

This factor is applied when the proof shows that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10). Although this factor was applied by the trial court, little emphasis was placed on it. The limits of this enhancement factor were explained in State v. Kelley, 34 S.W.3d 471, 480 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2000):

> [T]he trial court may consider this factor when the defendant endangers the lives of people other than the victim. See State v. Ruane, 912 S.W.2d 766, 784 (Tenn. Crim. App. 1995); State v. Johnson, 909 S.W.2d 461, 464 n. 1 (Tenn. Crim. App. 1995); see also State v. Butler, 900 S.W.2d 305, 314 (Tenn. Crim. App. 1994) (holding that factor (10) should not be applied when the victim is the only one at risk). In this case, the defendant fired three shots into a

car containing two people. The passenger, Chasity McGuire, testified that she ducked when she saw the explosion from the gun. The defendant put Ms. McGuire's life at risk, and thus, factor (10) applies.

Since only the victim was put at risk during the rape, enhancement factor (10) was not applicable.

Thus, in sentencing the defendant, the trial court applied enhancement factors (1), (4), (5), (6), (8), and (10), with the latter two being applied erroneously. In ascertaining the effect, if any, of the erroneous application of the two factors on the defendant's sentence, we note that of these factors, the trial court stated that it was giving great emphasis only to factor (1), the application of which the defendant does not dispute. We have concluded that the applicable enhancement factors are (1), (4), (5), and (6). Based upon the applicability of these enhancement factors and the fact that there were no mitigating factors, we cannot conclude that the trial court erred in imposing the maximum sentence of forty years. See Lavender v. State, 967 S.W.2d 803, 809 (Tenn. 1998) (holding that elimination of enhancement factor does not automatically require reduction of sentence); State v. Freeman, 943 S.W.2d 25, 32 (Tenn. Crim. App. 1996) (concluding that trial court's improper application of enhancement factors did not require sentence reduction, when other enhancement factors, but no mitigating factors, remained).

## CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-32-