IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 12, 2006 Session

## ANTHONY H. DEAN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-26821     Chris Craft, Judge**

**No. W2005-02319-CCA-R3-PC  - Filed December 7, 2006**

The Petitioner, Anthony H. Dean, appeals as of right from the judgment of the Shelby County Criminal Court denying post-conviction relief.  In 2000, a jury convicted the Petitioner of aggravated rape, and he was sentenced to forty years as a violent offender.  This Court affirmed his conviction and sentence on direct appeal.  Subsequently, the Petitioner filed a petition for post-conviction relief and several amendments thereto.  Following multiple hearings, the post-conviction court denied relief, and he now appeals to this Court.  In this appeal, he raises nine issues which, in substance, relate to the following two claims: (1) violation of his constitutional rights when he was not taken timely before a magistrate and (2) ineffective assistance of counsel.  After a review of the record, we affirm the judgment of the post-conviction court denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

William C. Gosnell, Memphis, Tennessee, for the appellant, Anthony Dean.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In February of 2000, the Petitioner was convicted by a Shelby County jury of aggravated rape.  As a result of this conviction, the Petitioner was sentenced to a term of forty years as a violent offender to be served in the Department of Correction.  On direct appeal, a panel of this Court affirmed the conviction and sentence. See State v. Anthony H. Dean, 76 S.W.3d 352 (Tenn. Crim.

App. 2001), perm. to appeal denied, (Tenn. Mar. 11, 2002).  As summarized on direct appeal, the facts underlying this conviction are as follows:

> The victim, R.G.,[1] who was 92 years old at the time of trial, testified that as of the day of the crime, August 1, 1998, she was 89 years old, turning 90 about two weeks later.  She said that she was awakened at about 4 a.m. after a man had come into her apartment through her balcony glass door.  As she tried to rise from the bed, the intruder grabbed her throat and pushed her back.  He tried to penetrate both her vagina and her anus, but was unsuccessful at first.  However, on a second attempt, he did penetrate her vagina.  As a result of the attack, the victim sustained tears and a laceration in her vagina and still had stiffness in her neck and pain in both her arm and shoulder at the time of the trial.  Also, because of the position she was forced into during the rape, she had to begin using a cane or a walker, and was still doing so at the time of trial.
>
> She testified that she recognized the intruder because he had been in her apartment the day before the attack.  She had noticed him near her apartment door, and he said that he lived in a nearby apartment and had not seen one like hers.  She invited him in and, during their conversation, said that she needed to have her hair cut.  He told her that he was a barber and could cut her hair.  He left but returned later that day, coming into her apartment without an invitation and telling the victim that he had come to cut her hair.  She told him that she did not want her hair to be cut then, and he left again.  While he was in her apartment, she told him that she kept her balcony door open during the night while she was sleeping.  She said that, during one of her conversations with the [Petitioner] prior to the rape, he told her that he lived in apartment 1011 with another person.  Subsequently, when first interviewed, the [Petitioner] was in apartment 1011.  The victim lived in apartment 1001.
>
> During direct examination, the victim testified that she had picked out a photograph of the man who attacked her, first saying, "That's the one I picked out and signed my name under it," and then explaining that she "[m]ight not have been positive but that's the one I picked out."  When asked, during her trial testimony, whether the man who raped her was in the courtroom, she identified the [Petitioner], saying, "He's sitting over there.  I saw him when he came in."  She also identified the [Petitioner's] black and white tennis shoes as being like those worn by her attacker.  During cross-examination, the victim was asked if, apparently during the preliminary hearing, she had identified another man in the General Sessions courtroom as her attacker and appeared to deny that she had done so.  However, Judge Tim Dwyer, of the Shelby County General Sessions Criminal Court, testifying as a defense witness,

---

[1]Because of the nature of the crime, we will identify the victim by her initials.

recalled that the victim, in her wheelchair, had testified during the preliminary hearing and had identified another man as her attacker.

Michael Carl Davis, who was the janitor and also a resident of the same apartment building where the victim lived, testified that he lived in apartment 1101, which was directly above the victim's apartment. He said that on the morning the victim was attacked, he was awakened just before 4 a.m. when a man, whom he identified as the [Petitioner], came into his apartment. When Davis asked the [Petitioner] why he was there, the [Petitioner] replied, "I was just hollering at you." Davis recognized the [Petitioner] as having been in the building on previous occasions trying to get residents to let him cut their hair. He said that he was shown a series of photographs either later that day or the following day, and identified the photograph of the [Petitioner] as the man who had earlier asked to cut his hair and who had entered his apartment the morning of the rape. Additionally, he identified the [Petitioner] in the courtroom as the same man.

Sandra K. Anderson, a sexual assault nurse examiner with the Memphis Sexual Assault Resource Center ("MSARC"), testified that she had met with the victim at the hospital on the day of the rape and collected evidence consisting of vaginal and oral swabs, a blood standard for DNA analysis, and pubic hairs. She described the injuries, which she observed to the victim, and said that she had placed the rape kit in a locked storage area of the MSARC.

Sergeant Donald Ray Dickerson, a sex crimes investigator with the Memphis Police Department, testified that he had met with the victim on the day of the rape at the Regional Medical Center in Memphis. After she gave him a description of the man who had raped her, he then began talking with residents of the apartment building to see if any of them recognized the man from the description. He was told that a man meeting the description "frequent[ed]" an apartment which was on the same floor and a few units away from that of the victim. After several visits with no response to apartment 1011, the door was opened by a man, whom Dickerson later identified as the [Petitioner]. Dickerson observed that the [Petitioner] matched the description given by the victim of her attacker. During this visit to the apartment, Dickerson saw a pair of tennis shoes matching the victim's description of the shoes worn by her attacker. The [Petitioner] said that his name was "Tony Adams" and gave several different dates of birth. He also gave Dickerson his mother's name and telephone number but, after talking with her, Dickerson determined that the man with whom he had spoken was not Tony Adams but was the [Petitioner], Anthony Harold Dean. With this information, Dickerson obtained a photograph of the [Petitioner] and showed it, along with photographs of others, to Michael Carl Davis. From this group, Davis identified that of the [Petitioner] as being the man who had come into his apartment on the morning of the rape. He also showed the photospread to the victim, and she identified and signed her name to a photograph of the [Petitioner].

Dickerson then distributed a photograph of the [Petitioner] to other police officers because he wanted to question the [Petitioner]. He was notified on August 5, 1998, that the [Petitioner] had been taken into custody. Taken from the [Petitioner] at that time were the tennis shoes he was wearing and an entry card for the apartment building. Dickerson interviewed the [Petitioner], who denied the rape or that he had been in the building when it occurred. The [Petitioner] remained in jail, and, on August 10, Dickerson obtained and served on the [Petitioner] a search warrant to take hair and blood samples, after the [Petitioner] had refused to voluntarily provide them. When the search warrant was served on the [Petitioner], he told Dickerson that he wanted to talk about the case.

In the interview room, the [Petitioner] again was advised of his rights and gave a statement, which was read to the jury, admitting that he had entered the victim's apartment and raped her. After the statement was completed, blood and hair samples were obtained from the [Petitioner] by an employee of the MSARC, who also photographed the [Petitioner] and took his thumbprint.

Dickerson said that, at the preliminary hearing, the victim had identified another man as the person who had raped her. In redirect examination, Dickerson said that the victim was in a wheelchair during the preliminary hearing and that the [Petitioner] was standing in a group of nine or ten black males, all dressed in jail-issued clothing, when the victim identified another as her assailant. He described the person whom she identified as having "a lot of similarities" with the [Petitioner], meaning they "had the approximate height, same height, same stature, build and somewhat complexion-wise" and the same "hairstyle."

. . . .

Raymond DePriest, a special agent forensic scientist with the TBI in Nashville, testified that he received and performed tests on the swabs from the victim and the blood sample from the [Petitioner]. Utilizing DNA profiling, he determined that the sperm fraction of both the vaginal and vulvar swabs from the victim matched the blood sample taken from the [Petitioner]. He testified that the "statistical probability of someone else being a contributor [of the sperm samples] is 1 in 6 billion." During cross-examination, he explained that this estimate actually was conservative and that the probability that a person other than the [Petitioner] had contributed the sperm recovered from the victim was one in forty-one quadrillion. Following the testimony of Agent DePriest, the State rested its case.

Kenneth Robinson, testifying as a defense witness, said that he was the building engineer for the apartment building in which the victim lived. He said that the apartments, including that in which the victim resided, had balconies approximately three feet wide which extended to the stairwells. A photograph

-4-

identified by the victim of the building showed that a horizontal, concrete ledge ran alongside each of the balconies and extended beyond them. Robinson testified that by standing on this ledge and holding onto balcony railings, a person could go from balcony to balcony.

Id. at 357-60.

On October 3, 2002, the Petitioner, with the assistance of counsel, filed a petition for post-conviction relief. In the petition, the Petitioner (1) contended his due process rights were violated when he was not taken timely before a magistrate and, therefore, the DNA samples taken from him during his unlawful incarceration should have been suppressed and (2) raised numerous claims of ineffective assistance of counsel. Thereafter, the Petitioner filed an amended petition on or about May 29, 2003, and a second amended petition on or about July 25, 2003. In both of the amended petitions, the Petitioner alleged additional grounds of ineffective assistance of counsel.

Also on July 25th, a hearing was held on the petition, at which only the Petitioner, trial counsel, and appellate counsel testified. On July 30, 2003, additional testimony was received. On this date, General Sessions Judge Joyce Broffitt testified to issues surrounding the search warrant for the Petitioner's hair and blood sample for DNA testing. Also, Mike Triplett, an employee of the general sessions court clerk's office, testified about the absence of an entry pertaining to the search warrant in the "general sessions search warrant logbook." On August 13, 2003, Toya Rice of the Shelby County Sheriff's Office testified regarding jail records that showed the Petitioner's visitors while incarcerated prior to trial.

On or about December 3, 2003, the Petitioner filed a "supplement" to his petition, contending that (1) the doctrine of inevitable discovery does not apply to the DNA samples obtained from him and (2) the photo array was so unreasonably suggestive that it led to the irreparable mis-identification of the Petitioner as the perpetrator. On September 16, 2004, the Petitioner filed a motion seeking modification of his sentence in light of Blakely v. Washington, 542 U.S. 296 (2004). On or about September 29, 2004, the Petitioner again sought to amend his petition, arguing that appellate counsel was ineffective for not pursuing the Blakely issue on appeal. On this date, a hearing was held addressing the Blakely issue.

After hearing all of the evidence presented, the post-conviction court denied relief by written order on September 15, 2005. This timely appeal followed.

## ANALYSIS

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be

resolved by the trial judge, not the appellate courts.  Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997).  The trial judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings.  Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.[2]

## I. Sixth Amendment

The Petitioner argues that his "due process rights were violated when he was not taken before a magistrate for six days after his arrest."  Following the Petitioner's August 5, 1998 arrest, the Petitioner remained in jail until he was taken before a general sessions judge on August 11.  Dean, 76 S.W.3d at 361.  During this period, Sgt. Dickerson obtained and served on the Petitioner a search warrant to take hair and blood samples for DNA analysis, after the Petitioner had refused to voluntarily provide them.  Id. at 359.  Agent DePriest performed tests on the swabs from the victim and the samples taken from the Petitioner, determined that the two matched, and testified that the "statistical probability of someone else being a contributor [of the sperm samples] is 1 in 6 billion."  Id. at 359-60.  On cross-examination, Agent DePriest "explained that this estimate actually was conservative and that the probability that a person other than the [Petitioner] had contributed the sperm recovered from the victim was one in forty-one quadrillion."  Id. at 360.

On direct appeal of his conviction, the Petitioner, relying on Tennessee Rule of Criminal Procedure 5(a) and the Fourth Amendment to the United States Constitution, argued that his confession and the DNA evidence should have been suppressed because he was not taken timely before a magistrate.  Id.  This Court concluded that the Rule 5(a) violation did not require suppression of the confession but that suppression was required under the Fourth Amendment.  Id. at 362-64.  However, this Court further held that suppression of the DNA evidence was not required: "[T]he obtaining of the [Petitioner's] bodily fluids pursuant to a valid search warrant was neither the 'fruit' of, nor tainted by, the illegal detention."  Id. at 364.

While the Petitioner frames the argument in his brief as a violation of due process, the Petitioner's argument focuses not on a violation of due process but on a violation of his Sixth Amendment right to the assistance of counsel.  Specifically, he contends that "the violation of Rule 5 is also a violation of the Sixth Amendment right to counsel."  The Petitioner did testify at the post-conviction hearing that he requested an attorney; however, the Petitioner did not proceed upon this theory, as evidenced by the fact that the post-conviction court did not address this issue in its order denying relief.

First, Tennessee Code Annotated section 40-30-106 provides, "The petition must contain a clear and specific statement of all grounds upon which relief is sought, including full disclosure of the factual basis of those grounds."  Tenn. Code Ann. § 40-30-106(d).  "Amendments to the petition shall conform substantially to the form for original petitions, except that matters alleged in the original petition need not be repeated."  Id. § 40-30-104(g).  Therefore, regarding the additional issue

---

[2]For the sake of clarity, we have re-ordered the issues from the manner in which they were presented by the Petitioner in his appellate brief and have also combined claims that dealt with the same issue.

-6-

of a Sixth Amendment violation, which was not addressed in his petition or by the trial court in its order denying relief, we agree with the State that the Petitioner has waived this issue by failing to raise it in his original or amended petitions. The claim cannot be raised for the first time on appeal.

Second, Tennessee Code Annotated section 40-30-106 provides:

A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Id. § 40-30-106(g). The Petitioner's claims for relief are not "based upon a constitutional right not recognized as existing at the time of trial[,]" and the Petitioner's failure to present these issues on direct appeal was not "the result of state action in violation of the federal or state constitution." Id. We conclude that the Sixth Amendment and due process claims should have been brought on direct appeal just as the Fourth Amendment violation was; as such, they are waived in the post-conviction setting. See Randy L. Jones v. State, No. M2005-00765-CCA-R3-PC, 2006 WL 1626931, at *22 (Tenn. Crim. App., Nashville, June 9, 2006), perm. to appeal denied, (Tenn. Sept. 25, 2006).

Finally, the Petitioner raised only a general assertion of the denial of due process in his petition for post-conviction relief:

The Court of Criminal Appeals . . . refused to suppress the taking of hair and bodily fluids pursuant to the search warrant of August 10, 1998, because the Petitioner had not in his appeal attacked the validity of the search warrant, and the Court could not consider the argument that the obtaining of bodily fluids was the "fruit of the poisonous tree."

Briefly, we note that the Petitioner's claim does not arise under the Due Process Clause but that the right to a prompt judicial determination of probable cause as a prerequisite to an extended detention following a warrantless arrest arises under the Fourth Amendment as applied to the states by the Fourteenth Amendment. See County of Riverside v. McLaughlin, 500 U.S. 44, 46 (1991). As discussed infra, the DNA evidence was obtained pursuant to a valid search warrant and, thus, the DNA evidence was neither the "fruit" of, nor tainted by, the illegal detention. See Dean, 76 S.W.3d at 364. As these issues were disposed of on direct appeal, we decline to get further bogged down in the discussion of irrelevancies.

## II. Ineffective Assistance of Counsel

Next, the Petitioner argues that he received the ineffective assistance of counsel. First, we note that many of the Petitioner's claims of ineffective assistance of counsel are waived. Rule 27 of the Tennessee Rules of Appellate Procedure provides in relevant part as follows:

> The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on.

Tenn. R. App. P. 27(a); see also Harvey v. State, 749 S.W.2d 478, 479 (Tenn. Crim. App. 1987). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b).

The State correctly points out that many of the Petitioner's ineffective claims do not meet the requirements of Tennessee Rule of Appellate Procedure 27(a)(7). Many of the allegations do not contain references to the record or citation to authorities. Some of the Petitioner's contentions do nothing but cite verbatim to the post-conviction court's order denying relief and contain little, if any, argument in addition to the post-conviction court's findings and conclusions. In several sections of the brief, it is admitted that the allegation has no merit and, in other sections, the Petitioner only provides facts and makes no actual argument. Moreover, the Petitioner does not provide this Court with any explanation as to how he was prejudiced by many of these deficiencies. In sum, the Petitioner has failed to comply with Rule 27, Tennessee Rules of Appellate Procedure, which requires that he "[set] forth the contentions . . . with respect to the issues presented, and the reasons therefor," as to why appellate relief is required. Tenn. R. App. P. 27(a)(7). Notwithstanding waiver, we elect to review the Petitioner's ineffective assistance claims.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by counsel and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. The petitioner bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The petitioner's failure to prove either deficiency or prejudice is a

sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

### A.  Security Measures

As his first ineffective assistance claim, the Petitioner contends that trial counsel failed to adequately investigate the security measures of the victim's building. Specifically, he submits that trial counsel should have done the following: (1) interviewed security personnel; (2) viewed the building's security surveillance tapes; and/or (3) presented a defense or called witnesses to testify to the building's security measures, "particularly dealing with the entry card necessary for access to the crime scene building."

Trial counsel testified that he sent an investigator to the victim's building and that the investigator interviewed a number of witnesses. He also stated that he personally went to the building and talked to the building engineers and investigated the balcony on the victim's floor. Trial counsel also said that he returned at night to observe the lighting conditions of the building. In fact, Kenneth Robinson, a building engineer for the apartment building in which the victim lived, testified as a defense witness at trial and relayed to the jury that "a person could go from balcony to balcony." Dean, 76 S.W.3d at 360.

Trial counsel testified that he issued a subpoena to the Memphis Housing Authority "to see if there were any tapes, or anything like that" but that he "could not get into anything like that." According to trial counsel, "the security system could be defeated simply by [residents] living in the building, allowing folks to come in, giving them their cards, giving them their codes." Trial counsel also testified that a friend of the Petitioner's, who lived in the victim's building, was often present

during court and that he asked the friend how people could gain access to the building without their own passes. Based upon this conversation, trial counsel determined that gaining access to the building was "simple. You give them a card and a code, or whatever and they get in." Therefore, we find this allegation of deficient performance without merit. Additionally, as noted by the post-conviction court, "the proof that the petitioner had ready access to the building was overwhelming."

Moreover, the Petitioner put on no proof to indicate what prejudice he suffered as a result of any alleged deficiency on the part of counsel. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). At the August 13th proceeding, Petitioner's post-conviction counsel made the following stipulation concerning the security measures at the victim's building:

> I talked to a Major Washington of the Memphis Housing Authority, and he indicated that they did have surveillance tapes back on 8/1 of '98 for the front door but they only kept them for about 30 days. So they're not available. And also as far as a card was concerned, at that time there was no specificity on the card . . . . [S]o we have nothing available on that . . . .

Based upon this stipulation, it appears that the Petitioner did not present security personnel to testify at the hearing because "there was no specificity on the card" and that no surveillance tapes were entered into evidence because they had been destroyed. We may not speculate on what benefit these security tapes might have offered to the Petitioner's case nor may we guess as to what evidence further investigation may have uncovered. Id. The Petitioner is not entitled to relief on this issue.

### B. Mental Evaluations

Next, the Petitioner contends that trial counsel was ineffective by failing "to file pretrial motions regarding the victim or a witness [Michael Carl Davis, the building janitor,] after learning they had mental problems." As noted by the post-conviction court, trial counsel did file a motion to have the victim evaluated based upon her age and mis-identification of the Petitioner at the preliminary hearing, and this motion was denied by the trial court. Regarding the witness Davis, trial counsel testified that he had "no way of knowing that something may have been wrong with Mr. Davis" prior to trial. Trial counsel testified that, during cross-examination, he was "testing" Mr. Davis' recollection and that Mr. Davis answered he "had just taken [his] medicine." According to trial counsel, this statement by Mr. Davis "came out, coincidentally." The post-conviction court concluded that the "Petitioner's trial attorney mined this thoroughly on cross-examination, even going into the nature of his medications over the objection of the state." Without any indication that Mr. Davis was incompetent or suffering from a mental illness, the evidence does not preponderate against the post-conviction court's finding that trial counsel was not deficient. See State v. Raymon Haymon, No. W2005-01303-CCA-R3-PC, 2006 WL 2040434, at *11 (Tenn. Crim. App., Jackson, July 20, 2006) (holding that it was not ineffective assistance for counsel not to request a mental evaluation when there was no indication that the witness was incompetent or suffering from a mental illness), perm. to appeal filed, (Tenn. Sept. 18, 2006).

### C. Independent DNA Expert

The Petitioner argues that his trial counsel "failed to hire a DNA expert to counter the State's DNA expert and failed to file pretrial motions regarding this evidence." In fact, trial counsel filed a motion titled "Motion by Indigent for Independent Chemical Analysis of Substance" in March of 1999. In the petition for post-conviction relief, the Petitioner presents his argument somewhat differently than it is presented in the appellate brief. In the petition he contends,

> Trial counsel also failed to have the assistance of an expert witness authorized by the trial court in the field of (STRs) DNA analysis. Petitioner would show that trial counsel's failure to have an expert witness to assist him in the proper DNA protocols and to point to appropriate questions for cross examination questions, prevented Petitioner's right to a fair trial.

At the motion hearing on June 14, 1999, trial counsel stated, "Obviously, . . . because of the compelling weight of DNA, it's imperative that Mr. Dean, as an indigent person, be allowed some means of having those results tested or examined by an expert." At the conclusion of the hearing, trial counsel further stated,

> And let me tell—I want to explain to the court, so the court will understand exactly what I'm saying. It may very well be in my best interest not to get another test for obvious reasons, but at least I need to talk with an expert. The expert might say you better leave that alone, or the expert might say wait a minute. Because obviously if I get a test, and I'm going to have to disclose the results of course, now we've got two people saying it. So I don't want to mislead the court, but I definitely need to speak with an expert on that.

At the post-conviction hearing, trial counsel testified that the Petitioner admitted to having sex with the victim and that the Petitioner alleged that the act was consensual. Based on this information from the Petitioner, trial counsel opined in a letter written to the Petitioner, "In any event, it would appear that if we start digging into the DNA to [sic] deeply it may be inconsistent with our defense." Trial counsel further testified that the Petitioner agreed to withdraw the request for an independent analysis of the DNA sample and that the Petitioner's assent was based upon "the concern that some of the findings may become discoverable and could come back to buttress the state's case." Appellate counsel confirmed trial counsel's testimony: "At the time the theory of defense that we were traveling under was going to be consensual sex and we did not want another DNA test, because for fear of the results confirming the one test that the state already had."

Although the Petitioner stated that he never told trial counsel that the sex was consensual, the post-conviction found that the Petitioner "did not a make a credible witness" and that trial and appellate counsel were "far more credible on this issue." The post-conviction court accredited the testimony of counsel and concluded that the Petitioner "in fact agreed . . . to waive his request to have an independent DNA test done or have an additional expert appointed." We see no reason to

disturb that determination on appeal. Moreover, trial counsel's decision not to pursue independent testing was an informed tactical decision.

Regarding the claim that trial counsel was deficient in his cross-examination of the DNA expert, this assertion is likewise without merit. At the post-conviction hearing, trial counsel testified to the following:

> Q. And it would have been helpful; wouldn't it, to have had a DNA person on your team to help you in your cross-examination? Even if you didn't make an analysis, say, of the specimen?
>
> A. It would have, but in all honesty, I had—this was not the first DNA rape trial that I had had. And I was familiar with the various methods of measurement of the LOGA—not the LOGA—I can't think of the name of it. But, I'm quite proud of my cross-examination. I was sufficiently prepared to give the state's witnesses a run—Mr. Dupriest— . . .

We agree that trial counsel's cross-examination of the DNA expert was very thorough. Moreover, the Petitioner did not present a DNA expert at the hearing for post-conviction relief and failed to avail himself of the post-conviction court's offer to have his DNA tested. See Black, 794 S.W.2d at 757. The Petitioner's claim of ineffective assistance is without merit.

### D. Photographic line-up

The Petitioner submits that trial counsel was ineffective for failing to challenge the suggestiveness of the photo array. In his brief, the Petitioner argues undue suggestiveness of the photographic line-up because the "Petitioner's clothes do appear to have a tear in the photo lineup while none of the other persons have torn clothing." However, the Petitioner's argument mainly focuses on the case of United State v. Wade, 388 U.S. 218 (1967). In his petition for post-conviction relief, the Petitioner frames the argument as trial counsel "failed to file a motion for a Wade hearing on the suggestive photospread shown the victim, particularly since the victim misidentified the Petitioner at the preliminary hearing."

In Wade, the Supreme Court held that a post-indictment lineup was a "critical stage" of prosecution at which the defendant was entitled to the assistance of counsel. Id. at 236-37. However, "there is no Sixth Amendment right to have defense counsel present when the State provides a pretrial photographic display to a witness." State v. Blye, 130 S.W.3d 776, 781 (citing United States v. Ash, 413 U.S. 300, 321 (1973); Houston v. State, 567 S.W.2d 485, 488 (Tenn. Crim. App. 1978)). Therefore, the Petitioner did not have the right to the assistance of counsel when the photo array was shown to the victim or the victim's neighbor, Michael C. Davis. Moreover, we note that, according to the handwritten signature and date on the Petitioner's photograph, the victim identified him on August 4, 1998, at 2:30, which was prior to his August 5th arrest and, thus, the right to counsel had not attached at that time. Id. at 780 (citations omitted) ("The constitutional right to assistance of counsel attaches at the time adversarial judicial proceedings are initiated against the

-12-

defendant."). We agree with the post-conviction court that "Wade is of no help to [the Petitioner's] cause."

Regarding the alleged suggestiveness of the photo array as it relates to ineffective assistance of counsel, we conclude that this claim is without merit. The post-conviction court found,

This court in addition has examined the photo spread entered as an exhibit in the trial, and finds it fair and not unduly suggestive. Although petitioner's clothes do appear to have a tear, there was nothing in the victim's statement or her testimony to suggest that the perpetrator's clothes were torn during the offense, and the clothes in the photograph do not match the description of the perpetrator's clothes in the statement or testimony at trial.

The post-conviction court then analyzed the five factors set forth in Neil v. Biggers, 409 U.S. 188, 199-200 (1972), and concluded "that any attack on the suggestiveness of the photo spread identification would have been fruitless, and would have had no effect on the outcome of petitioner's trial." We agree with the findings and conclusions of the post-conviction court. The Petitioner has failed to show that he received deficient performance or that he was prejudiced by the alleged deficiency.

### E. DNA Search Warrant

The Petitioner raises several ineffective assistance claims regarding the search warrant for his hair and blood samples to perform DNA testing. First, the Petitioner asserts that trial and appellate counsel should have attacked the search warrant because the Petitioner was not given a copy of the warrant. Second, the Petitioner claims that trial counsel "did not inspect the General Sessions Warrant book and discover that the DNA search warrant was never properly recorded as required by Tenn. R. Crim. P. 4(a)." Third, the Petitioner argues ineffectiveness because "trial counsel and appellate counsel failed to preserve for appeal the lack of probable cause issue dealing with the DNA search warrant."

### (1) Copy of the DNA Search Warrant

The Petitioner asserts that trial and appellate counsel should have attacked the DNA evidence because a copy of the search warrant was not served upon or left with the Petitioner as required by Tennessee Rule of Criminal Procedure 41. First, we note that trial counsel did raise this issue in the motion to suppress the DNA evidence and that testimony concerning this allegation was received at the motion to suppress hearing.

At the motion to suppress hearing, the Petitioner testified that he did not receive a copy of the search warrant, but Sgt. Dickerson testified that he did leave a copy of the search warrant with the Petitioner. At the time the warrant was served on the Petitioner, the Petitioner requested to speak with Sgt. Dickerson, and he was taken to the interview room where he admitted that he raped the victim. Dean, 76 S.W.3d at 359. At the conclusion of testimony on this issue at the motion to suppress hearing, the trial court ruled, "Well, the court is of the opinion that the search warrant is

proper on its face and that it was properly issued by Judge Broffitt and served on the [Petitioner]." A copy of the search warrant, signed on August 14, 1998, reflects a proper return.

Appellate counsel testified at that post-conviction hearing that he did not "recall what the record said about 41(c)" but that, "[i]f it had been the [Petitioner's] word against the police officer's word, [he] probably would not have" raised the issue on appeal. The post-conviction court found this claim to be without merit: "As there is no reasonable expectation that the Court of Criminal Appeals would have substitute[d] its opinion of the credibility of witnesses for that of the trial judge who actually observed their demeanor, any appeal on this ground would have no chance of success." Again, we agree with the post-conviction court. "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. Id. Appellate counsel relied on his experience as an appellate attorney to determine which issues to raise on appeal. See Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004). His decision not to raise this issue was one of strategy. The Petitioner has failed to establish ineffective assistance of trial or appellate counsel in regard to this issue.

### (2) Warrant Book
As his next assignment of error, the Petitioner claims that his trial counsel "did not inspect the General Sessions Warrant book and discover that the DNA search warrant was never properly recorded as required by Tenn. R. Crim. P. 4(a)." The post-conviction court concluded, "Tenn. Crim. P. 4, titled 'Arrest Warrant or Summons upon Complaint,' only applies to arrest warrants, not search warrants. Search warrants are covered by Rule 41, which has no such recording requirement. This allegation fails for lack of legal authority." In his brief, the Petitioner admits, "Counsel has researched Rule 4 of Tennessee Rules of Criminal Procedure and can not locate any authority. Rule 4 does not apply beyond arrest warrants or summons."

Despite the Petitioner's argument being wholly insufficient, we agree with the post-conviction court that the Petitioner's claim of deficient performance fails for lack of legal authority. The Petitioner cites no case law requiring the search warrant to be recorded in a docket book and, moreover, that the failure to do so requires suppression of the evidence obtained. Our supreme court has held that returns of warrants are ministerial in nature and that an irregularity in making the return does not invalidate the search. See State v. Calvert, 410 S.W.2d 907, 913 (Tenn. 1966). Moreover, a panel of this Court has held that,

> [w]hile Calvert and its progeny deal with the returns of warrants rather than their transmission to the clerk of the court having jurisdiction over the alleged offense, we find that the magistrate's duty of transmission is similarly ministerial in nature, and that the irregularity complained of here should not require suppression of the evidence obtained pursuant to the search warrant.

State v. Allen Prentice Blye, No. E2001-01227-CCA-R3-CD, 2002 WL 31086314, at *6 (Tenn. Crim. App., Knoxville, Sept. 16, 2002), aff'd, 130 S.W.2d 776 (Tenn. 2004). This issue it without merit.

### (3) Probable Cause

As his next attack on the search warrant, the Petitioner asserts that trial and appellate counsel should have preserved for appeal the issue of whether the search warrant established probable cause. In the search warrant, Sgt. Dickerson states that he "has a complaint filed with the Memphis Police Department on 01/01/98 that [the Petitioner] forcibly had sexual intercourse with her." The search warrant then gives the circumstances surrounding the rape and provides that sufficient evidence was collected from the victim to perform DNA analysis. As noted by the post-conviction court, the victim is not named in the warrant nor is there an explanation of how the Petitioner became a suspect.

After hearing testimony on this issue at the motion to suppress hearing, the trial court found,

> I think it's spelled out sufficient that Judge Broffitt [knew] what they were doing and what they were asking for. It doesn't appear to me from reading this, within the four corners of what I am reading, that it's confusing, other than it may be poorly drafted, but it's fairly clear, in my opinion, what they're asking for.

The post-conviction court also concluded that,

> although the information sworn to in the warrant is sparse, the warrant elicits the information that the petitioner has been charged with the sexual assault of a victim by a sworn affidavit, that an examination of the victim produced DNA material from the perpetrator, and that there is probable cause to believe that a search of petitioner would yield blood and saliva which can be tested, and finds the affidavit sufficient.

First, we note that, even if only broadly so, trial counsel did include this issue in the motion for new trial. Moreover, the determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Carpenter, 126 S.W.3d at 887. Finally, "[a] showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999). This Court agrees that the warrant sets forth sufficient facts for a magistrate to reasonably conclude that a nexus existed between the crime and Petitioner's hair and blood. Thus, the Petitioner's argument does not support a finding of deficient performance by trial or appellate counsel.

### F. Conflict of Interest

The Petitioner alleges deficient representation because trial counsel had an actual conflict of interest. Specifically, he states, "Ineffective assistance in that there was a conflict of interest with the Assistant Public Defender in General Sessions Court who was allowed to withdraw, and therefore there was a conflict with the entire Public Defender's Office."

Assistant Public Defender Nell Pallme was first assigned to represent the Petitioner. There arose a conflict between Ms. Pallme and the Petitioner regarding the Petitioner's desire to have a preliminary hearing: "What it boiled down to is, [the Petitioner], according to Ms. Pallme, kept changing his minds as to his strategy. She felt he was manipulating her. He said something about her and she then turned to him and used the 'F' word to him." Apparently, this conversation occurred within "ear-shot" of the general sessions judge handling the preliminary hearing. Thereafter, the general sessions judge removed Ms. Pallme from the case, and then Chief Public Defender of Shelby County A.C. Wharton, Jr. (trial counsel) was appointed to represent the Petitioner. The judge asked the Petitioner if he would accept Mr. Wharton, and the Petitioner responded, "I have no problem as long as he protects my rights." Mr. Wharton represented the Petitioner at the preliminary hearing and throughout the proceedings in the trial court.

The Petitioner testified at the post-conviction hearing,

> The problem with the Public Defender's Office representing me, the problem I had was the hostility that Ms. Pallme showed towards me. It was more or less she was going to go to her colleagues and was going to, like, "Hey, don't do anything Mr. Dean ask [sic] you to do, if you are appointed to him."

The Petitioner was then asked, "But, you and Mr. Wharton didn't have a bad relationship starting off; did you?" The Petitioner responded, "Yes, we did. I couldn't get him to come visit me, for one."

At the motion to suppress hearing on September 9, 1999, the Petitioner stated that he and trial counsel were "having a conflict of interest." The Petitioner also stated, "I haven't seen anything. He won't come to visit me." During this colloquy, the trial court stated to the Petitioner, "I'll get you copies of everything, Mr. Dean, before you leave today[,]" and also opined, "Right now he has one of the most competent counsel in Shelby County, Tennessee, representing him." The hearing then continued.

Both the United States and Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of appointed counsel at trial. See U.S. Const. amend VI; Tenn. Const. art. I § 9. However, the Sixth Amendment's protection includes no guarantee of the right to a meaningful relationship between an accused and his counsel, whether counsel be appointed or retained. Morris v. Slappy, 461 U.S. 1, 14 (1983); State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000). Neither the federal nor state constitutions requires that an indigent defendant receive counsel of his choice or counsel with whom the defendant enjoys "special rapport, confidence, or even a meaningful relationship." Carruthers, 35 S.W.3d at 546. The baseline guarantee is one of effective counsel, not preferred counsel. Id.

Trial counsel's performance was not deficient nor was it adversely affected by the "conflict" between the Petitioner and Ms. Pallme. See Andrew Cole v. State, No. W2002-01432-CCA-R3-PC, 2003 WL 22071451, at *4 (Tenn. Crim. App., Jackson, Aug. 29, 2003). According to trial counsel,

"It was nothing that pervaded the entire office." We agree. The Petitioner has not demonstrated that his counsel failed to perform in the Petitioner's best interest, had an actual conflict of interest, or was otherwise unable to discharge the task of representing the Petitioner. Moreover, disqualification of an entire governmental office is required only when an actual conflict of interest is present or confidential communications are disclosed. State v. Coe, 17 S.W.3d 193, 217 (Tenn. 2000) (citing Mattress v. State, 564 S.W.2d 678, 680 (Tenn. Crim. App. 1977)). No relief is warranted.

### G. Jencks Material

According to the Petitioner, he received ineffective assistance of counsel when trial counsel failed to obtain Jencks material that was relevant to the defense, specifically the statement of the victim that was audio-taped. At the motion to suppress hearing on September 9, 1999, Sgt. Dickerson testified that he took a statement from the victim on August 4th which was audio-taped and later transcribed and signed by the victim. As the State correctly asserts, this issue is inadequately briefed, and we glean from the petition that the August 4th statement is the statement to which the Petitioner is referring. It is unclear whether the Petitioner is arguing that the victim's statement was not obtained following cross-examination of the victim in accordance with Jencks or whether trial counsel was not prepared to cross-examine the victim because he did not request this statement prior to trial.

First, under Tennessee Rule of Criminal Procedure 16(2), reports or memoranda made in connection with the investigation of a case and statements made by state witnesses are not discoverable. Thus, the challenged material was not discoverable pretrial. See Tenn. R. Crim. P. 16(2). Second, Rule 26.2 is Tennessee's version of the Jencks Act which was created as a result of the Supreme Court's decision in Jencks v. United States, 353 U.S. 657 (1957). See State v. Brown, 871 S.W.2d 492, 494 (Tenn. Crim. App. 1993). Tennessee Rule of Criminal Procedure 26.2(a) provides for the following:

> After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

Tenn. R. Crim. P. 26.2. Under Rule 26.2, the State has no obligation to provide a defendant with a copy of a witness statement until after the witness has testified. See also State v. Taylor, 771 S.W.2d 387, 394 (Tenn. 1989) (holding that there is "no constitutional requirement that the State provide witnesses' statements prior to trial. The State has no obligation to produce statements of a witness until the conclusion of the witness' testimony on direct examination.").

As admitted by the Petitioner in this brief, "[t]here was a lack of evidence the trial attorney did not obtain to include [sic] all witness statements and the victims [sic] audio-tape. . . . No proof was presented of anything not known to the trial attorney." At the post-conviction hearing, trial

counsel testified, "Well, we got everything. I was there. I heard it. I used it in an attempt to impeach, right here on this very witness stand." Trial counsel was then asked, "Are you saying that you did receive all of the discovery that the state was obligated to give you?" to which trial counsel responded,

> Yes, not only received it, but used it during the course of trial. As a matter of fact, there was one part when we were trying to impeach her . . . [a]nd this was the arch typical, senior citizen, case that back fired. Because she said, I don't care what you say in here, that's the man who did it to me. And we had it. Probably would have been better off without it, but we had it when we tried to impeach her.

Trial counsel further testified that an investigator went to speak with the victim, who was "very polite" but "she wouldn't talk about the case."

At trial, trial counsel made the following statement at the conclusion of the direct examination of the victim: "Your Honor, this is one of those times I think I do have some Jencks and it's fairly lengthy. It may be—I just needed to get a copy of it, it's about, what, 7 or 8 pages long?" It is also clear from the record that trial counsel cross-examined the victim about the statement.

The post-conviction court concluded, "No proof was presented that [trial counsel] did not obtain this material, and no prejudice has been shown in any event." The post-conviction court obviously accredited the testimony of trial counsel, and the evidence does not preponderate otherwise. We agree with the post-conviction court that this allegation of ineffective assistance fails for lack of proof.

### H. Blakely v. Washington

The Petitioner contends that appellate counsel was ineffective for failing to "pursue Blakely error in sentencing." See Blakely v. Washington, 542 U.S. 296 (2004). The Petitioner's argument has been rendered moot by our supreme court's decision in State v. Gomez, which held that Blakely had no application to Tennessee's 1989 Sentencing Reform Act and that Tennessee's sentencing structure did not violate the Sixth Amendment. State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005). Moreover, the United States Supreme Court decided Blakely on June 24, 2004. In this case, our supreme court denied the Petitioner's application for permission to appeal on March 11, 2001, three years before Blakely was decided. Counsel's performance was not deficient for failing to anticipate any perceived change in the law. Our high court held that Blakely did not announce a new rule of law, was subject to plain error review, and that this "standard would not permit, much less require, Blakely's retroactive application in a post-conviction proceeding." Id. at 652 n.16. This issue is without merit.

### I. Permission to Appeal

In this claim of ineffectiveness, the Petitioner states, "[A]ppellate counsel did not raise in his Rule 11 application to the Tennessee Supreme Court four issues which he presented in his brief to

the Court of Criminal Appeals." In the Rule 11 application filed on the Petitioner's behalf, appellate counsel only raised one issue—chain of custody of the DNA sample taken from the Petitioner. The Petitioner's appellate counsel testified during the post-conviction hearing that, after reviewing the opinion of this Court, he believed that the other four issues raised on direct appeal had no merit. He also stated that his "thought process at that time was to try to get whatever issue [he] thought might be of value . . . and that might persuade the Tennessee Supreme Court to grant . . . permission to appeal." Appellate counsel explained his theory in preparing the application for permission to appeal, stating that the he believed the way to obtain a new trial was to get the DNA excluded in addition to the confession which had been excluded on direct appeal.

The Tennessee Supreme Court has stated that "[a]ppellate counsel are not constitutionally required to raise every conceivable issue on appeal." Carpenter, 126 S.W.3d 879 at 887 (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999); Campbell v. State, 904 S.W.2d 594, 596-97 (Tenn. 1995)). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." Campbell, 904 S.W.2d at 597. Moreover, the determination of which issues to raise on appeal can be characterized as a tactical or strategic choice, which should not be second guessed on appeal, and a petitioner must establish both deficient performance and resulting prejudice in order to establish ineffective assistance of counsel in this regard. Id.

The decision of the Petitioner's appellate counsel to only include the one issue that he believed was meritorious in the Rule 11 application appears to be a tactical decision — one that this Court will not second guess. See Joe L. Utley v. State, No. M1999-00560-CCA-MR3-PC, 2000 WL 374916, at *5 (Tenn. Crim. App., Nashville, Apr. 7, 2000). Moreover, the Petitioner has failed to identify any ground upon which the Tennessee Supreme Court may have reversed the decision of this Court on these issues. See id. Thus, the Petitioner has failed to show that he was prejudiced by the failure to include these issues in the Rule 11 application. See id. The Petitioner has failed to demonstrate ineffective assistance of appellate counsel.

## CONCLUSION

For the foregoing reasons, we conclude that the post-conviction court properly denied relief. Accordingly, the judgment of the Shelby County Criminal Court is affirmed.

_____
DAVID H. WELLES