# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs May 1, 2012

## STATE OF TENNESSEE v. JANICE GATES

**Direct Appeal from the Criminal Court for Shelby County**
No. 09-06381     John T. Fowlkes, Jr., Judge

_____

**No. W2010-02155-CCA-R3-CD  - Filed July 12, 2012**

_____

The Defendant, Janice Gates, pled guilty to two counts of vehicular homicide, a Class C felony.  The trial court sentenced the Defendant as a Range I, standard offender, to a concurrent sentence of six years for each conviction and ordered her to serve eighteen months in confinement before being released on probation for the remainder of the sentence.  On appeal, the Defendant argues that the trial court erred by denying a sentence of full probation.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Janice Gates.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Susan Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
### A. Guilty Plea Submission Hearing

This case arises from a car accident that resulted in the deaths of two brothers, Tracy Mosely and Adrian Mosely.  On October 8, 2009, a Shelby County grand jury indicted the Defendant on four counts of vehicular homicide.  The Defendant pled guilty to two of the

four counts in the indictment. At the Defendant's guilty plea submission hearing the State offered the following facts as a basis for the Defendant's guilty pleas:

[O]n Sunday, April 5th, 2009, a little bit after midnight, Memphis police dispatchers received a call regarding a traffic crash on I-240 in the southbound lane south of Walnut Grove in Shelby County.

Two police cars made the scene. Officers later advised the dispatcher that there was a person that was dead on arrival at the scene. At 12:18 hours the traffic investigation team was notified of the crash by the police dispatcher. Sergeant Harper - - and Sergeant Harper made the scene.

After making the scene, the investigator was advised that there w[ere] two individuals that were dead on arrival at the scene.

The preliminary investigation revealed that Tillman Station officers were already handling an earlier traffic crash on I-240 southbound, south of Walnut Grove, and all southbound traffic had come to a stop or was slowing down.

A vehicle, a 2008 GMC Yukon SUV driven by [the Defendant] was driving southbound on I-240 in the right lane when it struck the rear of a 1995 tan Honda Accord that was stopped for the other accident.

The Honda Accord was driven by . . . Tracy Ruse Mosely and a passenger in the Honda Accord was Adrienne [sic] Bernard Mosely. Both were injured on the scene and both died.

Investigators later found out that the driver and passenger were related, sibling brothers.

After the impact, the 2008 GMC veered off to the right and caused a chain reaction involving seven cars including that vehicle.

The driver of that vehicle, [the Defendant,] was transported to the Regional Medical Center by fire department ambulance after complaining of neck and chest pains.

The fire department attendants advised that there was a faint odor of intoxicant about the driver of vehicle one and a DUI officer was called to the

Regional Medical Center where a blood sample was retrieved by a nurse with Best Nurses while the DUI officer observed.

The BAC result was .07 and the [D]efendant also had Benadryl in her system.

The officers notified the spouses of the death of the two brothers and an airbag control module was also recovered from the [D]efendant's vehicle in this matter and the airbag control module report showed that the [D]efendant was traveling eighty-six miles per hour and that her brakes were never applied before impact.

The speed limit in the area of the interstate that she was driving was fifty-five miles per hour.

The Defendant agreed with the facts as presented by the State and her involvement in these crimes. The trial court reviewed with the Defendant the charges, the potential sentences, and her constitutional rights. The Defendant agreed that she was waiving her rights and voluntarily entering pleas of guilty. The trial court noted that the Defendant planned to apply for a probated sentence. In so doing, the trial court explained to the Defendant that the issue of probation would be determined at a later hearing. The Defendant confirmed that she understood and said that she wanted to proceed with the guilty plea. The trial court accepted the Defendant's pleas of guilty, finding that there was a factual basis for the guilty pleas and that the Defendant knowingly and voluntarily entered the guilty pleas.

**B. Sentencing Hearing**

At the sentencing hearing, the parties presented the following evidence: The Defendant admitted she was the cause of the accident and expressed her remorse. The Defendant explained that she attended her aunt's birthday party on Saturday evening, April 4, 2009. She said that food was served at the party but no alcohol. After leaving her aunt's birthday party, she went to the opening of her son-in-law's "lounge." At the opening, the Defendant consumed "half a glass of wine." The Defendant agreed that the toxicology report from the blood taken the night of the accident indicated the presence of Benadryl in her system. She explained that she took Benadryl earlier in the day due to a "migraine sinus headache."

The Defendant testified that she had an adult son and daughter and seven minor adopted children. The Defendant said that she had been a foster parent for fifteen years. The Defendant agreed that she had a twenty-year-old charge for fraudulent use of a credit card

on her record but had not had "any trouble" since that time. The Defendant said that she had never been charged with a DUI or been involved in a major accident.

The Defendant testified that she would be willing to follow all of the conditions of probation if the trial court ordered alternative sentencing. The Defendant agreed that she had several "pastoral counseling" sessions since the accident but no behavioral health counseling. The Defendant said that she would be willing to seek behavioral health counseling if ordered to do so by the trial court as part of her probationary sentence.

The Defendant identified a letter of apology she wrote to the victims' family members. The Defendant denied that she was an alcoholic or had a history of drug abuse.

On cross-examination, the Defendant said that she did not recall the accident "at all" and did not realize she was driving eighty-six miles per hour. The Defendant agreed that, in addition to the fraudulent use of a credit card conviction, she had convictions for malicious mischief, an additional incident for fraudulent use of a credit card, and shoplifting over $200. The Defendant also agreed that, in January 2007, she was charged with driving under the influence, driving under the influence with child endangerment, leaving the scene of an accident with property damage, and reckless driving, but she pled guilty to only reckless driving and leaving the scene of an accident. The Defendant explained that these charges stemmed from her reaction to a new medication prescribed for her severe back pain. She had taken the medication the night before, so she did not believe herself to be impaired when she drove her daughter to a tutoring session the following morning. A police officer, however, pulled her over for "weaving" after she hit a mailbox and almost hit an oncoming car.

The Defendant testified that she works as a CNA private duty nursing assistant. She said that "most of the time" she scheduled her work hours around her children's school schedule, but, if she needed help, her mother or adult son or daughter came to her house and cared for her minor children. The Defendant expressed concern that, if she were sentenced to jail, her minor children might be returned to "the system."

Upon questioning by the trial court, the Defendant recounted the events of the day leading up to the accident. The Defendant said that she took Benadryl before dawn on April 4, 2009. She woke up at 9:00 a.m. and made breakfast for her children. After breakfast, she told her children she still did not feel well and went back to bed for the day. At around 4:00 p.m., she got out of bed, dressed, and went to her aunt's birthday party. She left the birthday party at approximately 9:00 p.m. and went to her son-in-law's lounge opening. At the opening, she said her son-in-law poured her a glass of Sutter Home white zinfandel wine. She said that she only drank half of the glass of wine. The Defendant said, because she had not been feeling well, she had not eaten any food that day. At approximately 11:30 p.m., the

Defendant left her son-in-law's lounge and, on her drive home, she hit the victim's vehicle, killing both men. The Defendant said that she was "feeling fine" when she left the lounge and had not felt any of the effects of the wine or Benadryl.

The State showed the Defendant a picture of her car at the scene of the accident. The Defendant identified a bottle of Sutter Home white zinfandel wine lying on the roadway near the Defendant's car. The Defendant said that she did not take any wine with her when she left her son-in-law's lounge and had "no idea where that wine came from."

Lamont Gray, the Defendant's son-in-law, testified that the Defendant attended the grand opening of his establishment, Changes Entertainment Grill, on the night of the accident. Gray recalled that the Defendant arrived between 10:00 and 11:00 p.m., and he poured her a glass of wine. Gray testified that he was the only bartender that night. Later in the evening, as the Defendant left, he noticed that she had not finished her wine. Gray said that he did not recall the exact time the Defendant left, but he believed it was between 11:00 p.m. and 12:00 a.m.

Gray testified that, since the accident, the Defendant has not "been herself." He said that she expressed remorse and sorrow for the accident.

Elvora Vales, the Defendant's seventy-five-year-old mother, testified that her daughter changed after the accident. Elvora Vales said that the Defendant was no longer able to work as much as she did before the accident and was evicted from her home. Elvora Vales expressed some reservation as to whether, given her health, she could care for the Defendant's seven children if the Defendant were incarcerated.

Ebony Vales, the Defendant's daughter, testified that her adopted siblings ranged in age from eight years old to eighteen years old. Ebony Vales said that some of her adopted siblings had "problems" when they first came to the Defendant's home that have since improved. She said that her adopted siblings "have bonded very much so" with the Defendant. Ebony Vales expressed concern that her adopted siblings would have difficulty functioning in school without the Defendant due to their "behavior and emotional problems." One of her siblings had been assigned to "individualized education class," and two others were home schooled for a period of time due to their difficulty adjusting to the classroom. Ebony Vales said that, due to the number and special needs of some of the children, they would have to be separated if the Defendant were not able to care for her children.

Grady Thomas, the pastor at New Azuza Ministries, testified that the Defendant had attended his church for fifteen or sixteen years. Pastor Thomas said that the accident had a "telling effect" on the Defendant, and the Defendant had expressed sincere remorse about

the accident. Pastor Thomas said that the Defendant did a "wonderful job" with her children and found the children to be a "delight to have" at church.

The Defendant's attorney then named additional witnesses who were present in support of the Defendant and prepared to testify to the Defendant's character and remorse for the death of the two victims. These witnesses included: Ms. Carolyn Jeter, the Defendant's sister and former employer; Marva Cox, the Defendant's sister; Valerie Cane and Barbara Gates, the Defendant's cousins; Tarnisha Taylor, the Defendant's goddaughter; Keith Vales, Johnny Vales, and Errico Vales, the Defendant's brothers; "Angelie," the Defendant's sister-in-law; and Ray Davis, a family friend. The Defendant's attorney also submitted a "letter of support" from Sharon Pollack.

Darline Mosley testified that the victim Tracy Mosley was her husband and Adrian Mosley was her brother-in-law. Darline Mosley said that she and the victim had been married for two years but had known each other for ten years. She recalled that on April 5, 2009, the Jackson police came to her front door to deliver the news of her husband's death. Darline Mosley said that she had last spoken with the victim just before midnight. Darline Mosley read the following statement at the hearing:

Tracy Bruce Mosley was full of life. He loved people and was always willing to help someone. He enjoyed washing cars and riding his motorcycle and being with his brother Adrian Mosley and motorcycle club members. He also loved his family. We'd always - - when we come to Memphis, we'd always come in and check on his brothers and sisters, especially, Don.

At work he was a multi-tasker. From a forklift driver to machine operator, [ ] there wasn't anything that he couldn't do. They always could count on him to keep the third shift running all night. Every other weekend we would barbeque for my children and they loved his cooking.

How this affected my life the day I heard my body went numb. I could barely call my family members. I cried so hard that day I couldn't - - it was so hard to believe that I would never see him again. I took a leave of absence for about three weeks from my job. I didn't drive much. I didn't cook any meals. I lost a little weight. Every time I seen someone I knew or someone that knew him, it would trigger a memory and I would break down and cry.

I went back to work for about five months. Then I quit my job. We worked together for about ten years. Every night I would go to work and he wasn't there. When I was at work, he would always come by and give me a

break or just help me on the line.  When I quit, had to let go of the past and look ahead to the future.

I am closer to the Lord more than ever each day.  He is the one that's helping me through all of this.  I've been off work now for about a year now.  It took that length of time for me to heal and I'm still healing through it all and to reflect and think of the good times we shared.

I will always remember.  I loved my husband, Tracy B. Mosley.

Marvay Mosley testified that she was married to the victim, Adrian Mosley, for seventeen years.  Marvay Mosley read the following statement at the hearing:

I really don't know where to begin in explaining how this situation, this tragedy, has changed my life.  This situation has affected me in many, many ways, mentally, physically, psychologically, emotionally, and financially.  I truly believe that I would not be able to go on with my life without my significant other by my side.  I have been deprived of a husband, a friend - -

. . . .

 - - a confident and a supporter.  Adrian and I have been permanently separated, and I have to live with this tragedy for the rest of my life.  I know in my heart the only thing that has helped me get to the point where I am now in dealing with this situation is my belief and faith in God.  I know that it has been God's grace and mercy that is keeping me.  I pray for strength every day, constantly throughout the day.  Imagine being with someone for twenty plus years and have them suddenly and tragically taken away from you due to someone else's negligence.

Adrian was living a normal, healthy, happy life.  He wasn't sick.  He was fine up until the night that a trip to the auto parts store turned deadly.  He and Tracy were killed due to someone else's ill decision to drive impaired and recklessly.  I relive over and over again in my mind the night that I was awakened by police officers at our home coming to inform me that my husband had been killed.

I was truly, truly devastated and you can imagine [the] hurt that consumed my entire body when hearing this news.  I can't count the sleepless nights that I have encountered since this tragedy.  You can't imagine the state

of mind that I've been in since this tragedy occurred. You can't imagine the butterflies that I get in the pit of my stomach when I'm on the interstate and pass the Walnut Grove exit because I know that's where my husband and brother-in-law were killed.

I am enduring a substantial and significant loss of enjoyment of life due to this tragedy. I can go on and on explaining my feelings but I believe that unless you've experienced what I'm currently going through, you can only imagine how I truly feel.

I'm of the opinion that the [D]efendant should receive the maximum amount of time that she faces which is not enough for the crime that was committed taking the lives of two innocent people. Her negligence and decision to drive impaired and recklessly caused the death of two innocent people.

I have one question and that question is where is the justice for Adrian and Tracy?

After reading her statement, Darline Mosley added that she did not believe the Defendant acted intentionally but felt the Defendant should take "full responsibility for her action causing the death of these two people."

Stanley Mosley, the victims' brother, testified fondly about his two brothers. He recalled that Adrian mowed the lawn at his church the week before the accident and did not charge the church for his work. Stanley Mosley described his brothers as "all around good guys." He said that family gatherings and family trips are no longer the same with out his two brothers. He recalled the police coming to his home at 2:00 or 3:00 a.m. to inform him of his brothers' deaths and the ensuing grief over his loss.

Kathy Mosley, the victims' sister, read a statement at the sentencing hearings, in which she explained her feelings about the loss of her brothers.

After hearing the evidence, the trial court sentenced the Defendant as a Range I, standard offender to concurrent sentences of six years and required the Defendant to serve eighteen months of her sentence before being released on probation for the remainder of the sentence. The Defendant's driver's license was also revoked for five years. It is from this judgment that the Defendant appeals.

## II. Analysis

The Defendant contends that the trial court erred when it ordered her to serve part of her sentence in confinement. The State responds that the trial court sentenced the Defendant within the applicable range and properly exercised its discretionary authority. We agree with the State.

At the conclusion of the sentencing hearing, the trial court first noted that the Defendant's case was both "difficult" and "troubling." The trial court stated the statutory factors it must consider in sentencing and then summarized the evidence presented. The trial court acknowledged the significant loss experienced by the victims' families and also noted the tremendous job the Defendant had done as a foster parent and adoptive parent. In considering sentencing for this case, the trial court stated the following:

> And so I have taken into account the information contained in the presentence report. I have listened to all of the information about the physical condition, mental condition, as well as social history of the defendant, it is significant. The facts and circumstances of the case. What I have to work with [ ] is an egregious very bad offense. Criminal history of the defendant does play a part in this case in light of the fact that [the Defendant has convictions for] leaving the scene of an accident and reckless driving. And whether or not full probation will unduly depreciate the seriousness of this offense. This is a very serious offense. Impairment was involved based upon what I have heard here. . . . [I]t's difficult to make a decision with regard to the extent. But operating vehicles on the highways, even drinking small amounts of alcohol with drugs created a very dangerous circumstance where two individuals lost their lives.

Finding full probation inappropriate in this case, the trial court ordered the Defendant to serve eighteen months in confinement with the remainder of her sentence to be served on probation.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a *de novo* review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. This means that, if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the

-9-

1989 Sentencing Act, Tennessee Code Annotated section 40-35-103, we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a *de novo* review of a sentence, we must consider: (1) any evidence received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the offense; (6) any mitigating or enhancement factors; (7) any statements made by the defendant on his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

To meet the burden of establishing suitability for full probation, a defendant must demonstrate that full probation will subserve the ends of justice and the best interests of both the public and the defendant. *State v. Blackhurst*, 70 S.W.3d 88, 97 (Tenn. 2001). The following criteria, while not controlling the discretion of the sentencing court, shall be accorded weight when deciding the defendant's suitability for full probation: (1) the nature and circumstances of the criminal conduct involved; (2) the defendant's potential or lack of potential for rehabilitation; (3) whether a sentence of full probation would unduly depreciate the seriousness of the offense; and (4) whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes. T.C.A. §§ 40-35-103(1)(B), -103(5), -210(b)(4) (2010); *see also Blackhurst*, 70 S.W.3d at 97.

In the case under submission, the Defendant is eligible for full probation because her sentence is ten years or less (subject to certain statutory exclusions not relevant here). T.C.A. § 40-35-303(a) (2009). Although full probation must be automatically considered by the trial court as a sentencing alternative whenever the defendant is eligible, "the defendant is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b) (2010), Sentencing Comm'n Cmts.

The trial court ordered the Defendant to serve eighteen months of her six-year sentence in confinement with the balance to be served on probation. The trial court properly considered the presentence report, the facts, and circumstances surrounding the offense, the Defendant's amenability to correction, society's interest in protection from further criminal conduct by the Defendant, and the need for deterrence. The trial court based its denial of full probation upon its sound findings that the Defendant had previous criminal convictions for

similar conduct, the accident involved impaired driving by the Defendant, the Defendant's conduct resulted in two deaths, and full probation would unduly depreciate the seriousness of the offenses. *See* T.C.A. §§ 40-35-103(1)(B), -210(b)(4) (2010).

At the sentencing hearing, the Defendant initially denied any convictions other than one conviction for fraudulent use of a credit card. On cross-examination, however, the Defendant admitted to additional convictions and charges that included driving under the influence, driving under the influence with child endangerment, leaving the scene of an accident with property damage, and reckless driving; she, however, pled guilty to only reckless driving and leaving the scene of an accident. In this case, the Defendant took medication, did not eat all day, and then consumed alcohol. The Defendant drove eighty-six miles per hour in a fifty-five-mile-per-hour zone and hit the victims who were in a stopped vehicle. The evidence showed that the Defendant never applied the brakes prior to impact. The evidence does not preponderate against the trial court's finding that the nature and characteristics of the criminal conduct warranted a sentence that included some confinement. *See* T.C.A. § 40-35-210(b)(4) (2010).

Thus, because the Defendant has failed to demonstrate that full probation will subserve the ends of justice and the best interests of both the public and herself, we conclude the trial court properly denied the Defendant full probation, ordering her to serve eighteen months of the six-year sentence in confinement and the remainder on probation. *See* *Blackhurst*, 70 S.W.3d at 97. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE